BANK OF MONETTE *v.* HALE.

Opinion delivered June 10, 1912.

1.  BILLS AND NOTES—BONA FIDE PURCHASER.—Before one can become a *bona fide* holder of a negotiable instrument, he must take it *bona fide,* for a valuable consideration, in the usual course of business, before maturity, and without notice of any existing defense.  (Page 394.)

2.  FRAUD—WHAT CONSTITUTES.—Representations, to be fraudulent in law, must be material to the contract or transaction which is to be avoided, and must be made by one who either knows them to be false, or else, not knowing, asserts them to be true, and made with intent to have the other act upon them to his injury, and such must have been their effect.  (Page 396.)

Appeal from Craighead Circuit Court, Lake City District; *W. J. Driver,* Judge; reversed.

STATEMENT BY THE COURT.

Appellant sued appellee for $375 upon a negotiable promissory note executed by him on April 1, 1909, payable to his order one year after date, with interest, which was indorsed,

and on the next day transferred and delivered to appellant for a valuable consideration.

Appellee admitted the execution and indorsement of the note; denied that it was transferred to appellant for a valuable consideration, or at all, and that it became the owner thereof, and alleged that the president of appellant bank, J. D. Blankenship, solicited appellee to subscribe for five shares of the capital stock of the Mississippi Valley Life Insurance Company, at the time representing that the shares were of the par value of $100 each, and, as an inducement for him to execute the note, agreed that when the shares of stock were delivered if appellee did not want them that he would take the shares of stock and pay the note. That he had no knowledge nor means of knowledge of the value of said capital stock. That, relying upon the representations of the said Blankenship as to the par value of said capital stock in said insurance company and upon his, the said Blankenship's, agreement, to take said stock when it should be tendered to said defendant if he, the defendant, did not care to receive said stock, he executed said note. That the said note was obtained through fraud and misrepresentation, and that said Blankenship at the time of its execution was a party to said representation and made the same and had full knowledge of all the facts under which said note was executed.

It was alleged further that the consideration for the note had failed; that no shares of capital stock were ever delivered to him; that he has been informed that the par value of the capital stock of the insurance company was $25 per share and not $100 per share, and that immediately upon ascertaining that fact he had informed Mr. Blankenship, the president of the bank, in the presence of the cashier of the Bank of Monette, that he would not receive five shares of the value of $25 per share in satisfaction of the agreement entered into for the five shares of stock of $100 par value per share; and that at no time has any stock or shares of the capital stock of said life insurance company been delivered or tendered to this defendant in payment of said note; that said representations made by the said Blankenship were made with the knowledge that the par value of the capital stock of said company was $25 per share, and not $100 per share.

The evidence tends to show that the agents of the life insurance company talked up the sale of its stock to J. E. Blankenship, president of the bank, and that he and the cashier thereof bought some of the stock, paying $75 a share therefor, at the time understanding that it was worth $100 per share, and that Blankenship represented to several others that it was a good investment, appellee among the number, and recommended that they subscribe for some of the stock. Mr. Blankenship stated that he paid the life insurance company $750 for ten shares of the stock of the par value of $25 each. He understood when he bought it that it was worth $75 per share, and it was represented to him that it would be worth $100 per share shortly, and he thought at the time that he was getting $100 shares instead of $25 shares for his $75. That he so understood it until his stock was delivered. He considered the investment a good thing, and had some of his friends take some of the stock. He introduced the life insurance agents to appellee and several others, and said: "I told him that I had a notion to make him the proposition that if he was dissatisfied with his stock when the note come due that I believed I would take the stock off his hands and pay the note. I told him: 'I believe I will be safe in making you that proposition.' I never heard of it after that, and never had the stock directed to me, and thought no more of it. Q. Were you present at the Bank of Monette the morning after this stock was sold to Mr. Hale, and did Mr. Hale come to the bank and talk to you and Mr. Ashby about this note? A. I have no recollection of being present at the bank at that time."

He said further that he had never written to the insurance company anything about the stock, and had sold his stock to a broker at Little Rock for $40 a share. He had no interest in the sale of the stock to appellee. He represented it as being a good investment, and thought it was at the time, and had nothing whatever to do with the buying by the bank of the note sued on.

Appellee testified that he was a farmer, had worked as a carpenter, and had worked a couple of years for Mr. Blankenship and his partner in their store selling goods; that he had been knowing Mr. Blankenship, president of the bank, for

twenty-five years and had done business with the bank. He also knew the cashier, Mr. U. O. Ashby. He acknowledged the execution of the note sued on, and stated the circumstances under which it was given, as follows:

"I went down town one night, and Mr. Blankenship commenced on me to sell me stock in the Mississippi Valley Life Insurance Company, and we talked fifteen or twenty minutes, maybe half an hour. I told him that I did not want the stock, and was not able to buy it. We talked on, and he told me, he had seven hundred and fifty dollars' worth, and Mr. Ashby had seven hundred and fifty dollars' worth, and his boys had all taken stock, and Tom Pollard and John Pollard had taken stock. He said it was a money-making thing. He wanted me to take it, and I said I was not able. He said if I was not that I could give a note and when the note came due he would take care of it if I did not want the stock. He said he wished he had more of it, and that he had seven hundred and fifty dollars' worth and did not care if he had fifteen hundred dollars of it. He said: 'If you will take it, and are not satisfied with it, I will take it off your hands.' He said it was worth seventy-five dollars then, and in three weeks it will be a hundred. I still would not take it, and he went off and got the agent. They talked some little bit, and then had this note drawed up. Mr. Blankenship said: 'Sign it. You need not be uneasy.' I signed it. Q. Why did you sign it? A. They had it drawed up, and I thought I was getting hundred-dollar shares for seventy-five dollars. Q. Did you believe it? A. I could not tell. I thought it was because they told me. Q. If you had not believed that, would you have signed the note? A. No, sir. Q. Who made the note? A. The man that was selling the stock. Mr. Blankenship made me acquainted with him. Q. What did he do with the note, do you know? A. I think he turned the note over to Mr. Blankenship after it was signed. I don't know what he did with it."

He also stated that on the morning after the note was signed he found out they were only getting $25 shares for $75 which was not satisfactory, "and I went to town, and Mr. Blankenship and Mr. Ashby were in the bank. I went in and told them that the shares were only $25, and they said:

"Yes." I told them it was misrepresented to me, and I did not want it. I said: "You can pay that note and take it off my hands." They said it had been misrepresented to them. I asked where the men were, and they said at Manila. I said, I would not pay for it. Q. That was the next morning? A. Yes, sir. Q. When? A. I don't remember the time. Q. Did either of them say they owned the note? A. Not at that time. Q. Neither said they had bought it? A. No. Q. How long after that before they told you they had bought it? A. I guess a week or two. Some mail come to the office, and I would not take it out. I told the postmaster if it was from the insurance company I didn't want it. I said: "You can turn it over to Mr. Blankenship." I also told Mr. Blankenship that the stock had come, and if he wanted it he could take it; that I didn't want it.

On cross examination, to the question, "You are positive you went to the bank the next day?" he answered, "Yes, sir; I went out there to see them as soon as I found that I was getting $25 stock for $75. They told me the agent was at Manila. Mr. Ashby said: "He is in Manila now."

Further: "Q. The Bank of Monette was not mentioned in this transaction when the agent of this company sold you the stock, was it? A. No, sir. Nothing was said about the bank. Q. Did you rely upon the representation of Mr. Blankenship that if you purchased this stock and were dissatisfied with it he would take it off of your hands? A. Yes, sir. Q. You did not rely upon the Bank of Monette? A. I reckon I did. I knew they would handle the paper. Q. You relied mostly upon Mr. Blankenship? A. I reckon I did. I thought he would do what he said. At that time Mr. Blankenship said his boys had bought stock and both of the Pollards. They were in there that night. I think Mr. Ashby came in, and they finished the note, and I signed it. Q. You had executed the note at that time? A. Yes, sir; I had signed it."

U. O. Ashby testified that he was cashier of the bank, and bought the note sued on before the train left for Manila on the day after it was executed, answering as follows:

"Q. Tell the jury from whom you bought this note, as cashier? A. It was the agent selling stock for the Mississippi Life Insurance Company. I do not just recall his name. I

have it at the bank, but I do not remember just now. I bought it on the 2d day of April, the day after it was given. Q. Did you pay for it at that time? A. Yes, sir. Q. How much did you pay for it? A. Three hundred and seventy-five dollars. Q. Did you know at that time whether the defendant, G. D. Hale, had any defense on that note? A. No, sir; I did not. Q. Had you any business transactions with Mr. Hale? A. Yes, sir; I have had some business along with him ever since I have been in the bank there. Q. You knew his financial standing in the community, did you? A. I thought I did. Q. And bought the note upon the credit of Mr. Hale? A. Yes, sir."

He said further that he did not consider it necessary to have the agent indorse the note, as it was payable to the order of the maker and indorsed by him; that he considered when a man made a note payable to himself, had indorsed it, that it was just like a check to bearer, that it did not need any indorsement. That he handled other notes from Tom and John Pollard and Doctor Thorn made in the same way. That he gave a time deposit slip to the insurance company for the money, drawing 4 per cent. interest, and kept the money for the twelve months until the notes were due. He did not ask Mr. Hale about the note, and that Mr. Blankenship had nothing whatever to do with the purchase of the note by the bank, and he did not come up there; that he knew Blankenship had been helping to sell the stock; that when he bought his stock he understood they were getting $100 shares of stock for $75, and did not know any better until the certificates of stock came, and they were $25 each; that they did not tell him that the face value of the shares was $100, but that it was worth $100.

There was other testimony by those who has purchased stock, along the same line. All the others paid for their stock, however, and pocketed the loss, thinking, as they said, that "they were stuck, and there was no use complaining about it."

The court instructed the jury, which returned a verdict in favor of appellee, and from the judgment the bank appealed.

*Hawthorne & Hawthorne,* for appellant.

1. A naked representation of the value of property sold, by which a buyer is induced to take it at a price in excess

of its value, of which the seller is aware at the time of making the representation and sale, furnishes no cause of action for fraud. 56 N. Y. 83; 2 L. R. A. 743; 92 U. S. 1; 70 L. R. W. 349.

2. Mere puffing of commodities, or false representations of the profit which may be derived, will not avoid a contract. 6 Ark. 513; 1 *Id.* 31. A false representation to be actionable must not only mislead, but must be fraudulently made and with that intent. 38 Ark. 334. Blankenship certainly believed his statements true. 15 L. R. A. (N. S.) 409; 17 *Id.* 240.

3. Plaintiff was an innocent purchaser, before maturity for value. 94 Ark. 100; 61 *Id.* 81; 48 *Id.* 454; 49 *Id.* 465; 53 *Id.* 523.

4. A corporation is not chargeable with the knowledge of its officers, unless it is shown that his knowledge was acquired in an official capacity. 36 Am. St. 710; *Ib.* 705; 121 Mass. 490; 35 Am. St. 770, 788. The president was not present when the note was purchased, and the cashier had no notice of any defense. 24 Am. St. 225, and notes 228 to 233.

*Lamb & Caraway,* for appellee.

1. The note was procured by fraud, and no recovery could be had by the insurance company. The bank was not a *bona fide* holder. 61 Ark. 81, 120; 94 *Id.* 265; 97 *Id.* 265; 141 S. W. 759.

2. When one refers a party with whom he is dealing to another for information with reference to quality, value, etc., he is bound by the information received. 97 Ark. 265; 120 Mass. 490.

KIRBY, J., (after stating the facts). It is contended that the bank is an innocent holder of the paper without regard to the circumstances under which it was executed, and therefore entitled to recover.

"A *bona fide* holder takes negotiable paper free from all equitable defenses, that is, all those defenses that do not appear on the face of the paper and by which the paper is not declared invalid by statute. But, before one can become a *bona fide* holder of a negotiable instrument, he must take it (1) *bona fide,* (2) for a valuable consideration, (3) in the usual course of business, (4) before maturity, and (5) without notice of any existing defense and of dishonor thereof. If the purchaser

can be charged with notice of the defense or defect of title, he is not a *bona fide* holder of the instrument; such notice, of course, must exist at the time the paper is transferred to him or before he paid for it." *Hogg* v. *Thurman*, 90 Ark. 97.

In *Bothell* v. *Fletcher*, 94 Ark. 102, the court said: "The *bona fide* character of a holder of negotiable paper can be destroyed only by proof of his knowledge (or facts of which he would have to take notice) of some defects or fraud in connection with the execution of the instrument, rendering same invalid in the hands of the payee and of his purchase thereof notwithstanding such knowledge. In such case he would not be an innocent holder, even if he paid value and had the instrument transferred to him before maturity."

The maker of a negotiable note can not avail of the defense that it was procured through fraud or mistake, when sued on by an innocent holder thereof. *Lanier* v. *Mortgage Co.*, 64 Ark. 39; *Southern Sand & Material Co.* v. *People's Savings Bank & Trust Co.*, 101 Ark. 266.

Now, it is undisputed that the bank purchased in the usual course of business the twelve months' note, by its terms negotiable, on the next day after it was executed, and paid therefor its full face value, without any knowledge on the part of the cashier of the bank, who made the purchase, of any existing defense thereto and without notice of any fact that should have put him upon inquiry.

It is true appellee testified he called at the bank the day after its execution and told the president and cashier that he had ascertained that the shares of stock of the insurance company were only $25 each; that it was misrepresented to him, and he did not want the stock, and would not pay for it, and said to Mr. Blankenship: "You can pay that note and take it off my hands." That he asked where the agents of the insurance company were, and was told they were at Manila. But the president and cashier of the bank both, however, deny that any such conversation occurred on the next day, the day the note was purchased, and the burden of proof was on appellee to show that the bank had actual knowledge of his defense when it bought the note, or notice of such facts indicating that its action in the purchase thereof amounted to bad faith. *Old Nat. Bank* v. *Marcy*, 79 Ark. 153; *Thompson*

*v. Love,* 61 Ark. 87. And, if the conversation did occur as appellee states it did, it does not contradict the cashier's statement that the note was already purchased and paid for at the time, before the train left for Manila, and we are of the opinion that there is no testimony showing bad faith on the part of the bank in the purchase of the note, and that it became a *bona fide* holder by such purchase.

The testimony shows that those at Monette who purchased the stock of the life insurance company did so under the belief that they were getting shares of stock of the face value of $100 for $75. The agents represented that the stock was worth $75 per share at the time, and would soon be worth $100. The shares of stock were of the face value of $25 each, and were sold for $3 for each $1 of the face value by the agents of the insurance company in its organization. But there is no evidence that Blankenship, the president of the bank, had any knowledge whatever that the stock was other than the agents represented it to be, nor that he represented that it was of the face value of $100 per share; while it is true that he and all others to whom he suggested that it was a good investment purchased it and paid therefor the full amount of three for one, having in mind at the time that they were getting hundred dollar shares of stock for seventy-five dollars, but without any specific representation made by any one that such was the case. There was no testimony showing that he received any consideration or benefit from the sale of the stock nor that he recommended it otherwise than because he thought it a good investment. He made no false representation, knowing it to be false, to secure the execution of the note by appellee, nor did he, not knowing, assert any representation to be true, with the intent to have appellee act upon it to his injury, and the fact that he and his friends took and paid for the stock as agreed conduces strongly to show that he acted in entire good faith in the representation made by him.

Representations, to be fraudulent in law, must be material to the contract or transaction which is to be avoided, and "must be made by one who either knows them to be false, or else, not knowing, asserts them to be true, and made with the intent to have the other party act upon them to his injury, and such must be their effect." *Evatt* v. *Hudson,* 97 Ark.

268; *Jaratt* v. *Langston,* 99 Ark. 438; *Brown* v. *LeMay,* 101 Ark. 95.

Blankenship, the president of the bank, so far as the testimony shows, had no knowledge of any false representations having been made by any one, if same were made at the time of the execution of the note and its purchase by the bank, nor of any defense to or infirmity in the note, nor any notice which would deprive the bank of the defense of a *bona fide* purchaser for value at the time the note was acquired by it, even conceding that his knowledge of the facts relating to the transaction would be chargeable to the bank in the purchase of the note.

The instructions given by the court did not fairly submit the issues to the jury in accordance with the law as declared herein, and the judgment is reversed and the cause remanded for a new trial.