WALLIN v. DONNAHOE.

Opinion delivered December 12, 1927.

1. MORTGAGES—LEASE BY A MORTGAGOR.—A mortgagor has the right, without the mortgagee's consent, to lease the land mortgaged subject to the lien of the mortgage, and the mortgagee had the right to foreclose on default in payment of the money secured.

2. LANDLORD AND TENANT—COVENANT OF QUIET ENJOYMENT.—A covenant of quiet enjoyment was necessarily implied in a contract for leasing lands covered by a mortgage.

3. MORTGAGES—RIGHT OF PURCHASER AT FORECLOSURE SALE.—A purchaser at a mortgage foreclosure sale of leased premises became entitled to the subsequently accruing rents from the lessee and had a right to require the rents to be paid to himself.

4. BILLS AND NOTES—INNOCENT PURCHASER.—One who took notes in payment of existing indebtedness due from the payee, knowing that the consideration therefor had failed, since they had been given for rent to become due, and the mortgage on the leased land had been foreclosed before the rent became due, was not a *bona fide* holder, being charged with notice of such defenses.

5. BILLS AND NOTES—BONA FIDE HOLDER.—One who took notes under circumstances charging him with notice of defenses thereto was

in no better position than the first holder of the notes against the defense of failure of consideration.

6. BILLS AND NOTES—FAILURE OF CONSIDERATION OF NOTES—CANCELLATION.—Where the consideration for notes given for rent to become due in the future failed because a mortgage on the land had been foreclosed before the rent became due, and a transferee took the notes in payment of existing indebtedness with knowledge of the circumstances showing that the consideration for the notes had failed, *held* that the notes were subject to cancellation in the hands of such transferee.

Appeal from Crittenden Chancery Court; *J. M. Futrell,* Chancellor; reversed.

*S. V. Neely,* for appellant.

*R. V. Wheeler,* for appellee.

KIRBY, J. Appellants brought suit to cancel two notes executed by them to S. D. Donnahoe, one of the appellees.

It was alleged that on December 15, 1923, they leased from Donnahoe certain lands in Crittenden and Cross counties for a period of five years, beginning January 1, 1924, at a yearly rental of $320. That they paid the first three years' rent in cash in advance and executed two promissory notes, each for the sum of $320, payable, one January 1, 1927, and the other January 1, 1928, for the rent for the years 1927 and 1928. That, at the time of the execution of said lease and notes, the Missouri State Life Insurance Company held a deed of trust on the lands included in the lease as security for a $25,000 loan; that, since the execution of the lease contract, default has been made in payments due to the said Missouri State Life Insurance Company, which had filed suit to foreclose the deed of trust; that said Donnahoe was insolvent, and had stated to appellants that he would make no attempt to pay the amount due the insurance company, but would allow the lands to sell; that appellants had requested him to return the notes given for the rent for the years 1927 and 1928, appellants having been deprived of the possession of the lands by the foreclosure of the mortgage, but he had refused

to do so, and alleged that the notes were in his possession and under his control, and prayed that they be canceled.

Defendants answered, admitting the execution of the lease contract and the payment of the money, but denied that the payments were for any particular period. Admitted that the lands were incumbered by the deed of trust, and alleged that appellants were informed about it and agreed to make the necessary payments to continue the appellees in possession of the premises; admitted that the lands included in the deed of trust were insufficient to pay the insurance company, and that he was insolvent and unable to pay the company; denied that he had been requested to return the notes to appellees and that he could have returned them, for the reason that he had, on August 15, 1924, transferred said notes to H. Blair in payment of an existing indebtedness, which had been previously incurred for legal services, and that appellee, Donnahoe, was not then the owner or holder of the said notes. Also filed a cross-complaint, stating that appellants were informed about the deed of trust when the lease contract was made and took it subject to the rights of the mortgagee, and agreed to pay all the money becoming due on said mortgage, if not paid by appellee, as part of the consideration of the lease contract, and that, by mutual mistake, the clause in said contract expressing said agreement was not correctly drawn, and prayed reformation of same to express the agreement actually made.

Appellants answered the cross-complaint on October 31, 1924, denying that defendant had transferred the notes to H. Blair, and alleged that, if they were in fact transferred to Blair, it was without consideration and with full knowledge on the part of Blair of the failure of consideration for said notes and of the lease contract between the appellants and Donnahoe, under which they were executed, and alleged that said Blair was not an innocent purchaser of the said notes for value, and denied all the other allegations of the cross-complaint.

The court found that the notes were not subject to cancellation in the hands of Blair, unless he was holding same for the said Donnahoe, and that appellants were not entitled to the cancellation of the entire notes, but only of the amount thereof in excess of $500, with interest from August 1, 1925, at six per cent. per annum, and decreed accordingly, requiring appellants to pay all costs, and this appeal is prosecuted from this decree.

The undisputed testimony shows that all the parties had notice of the mortgage of the Missouri State·Life Insurance Company covering the lands leased, when the lease contract was made, and also that H. Blair, the attorney of Donnahoe, to whom the notes were transferred, had knowledge of the mortgage or deed of trust of said insurance company, knew what lands were included in it, and told his clients that they could not lease the lands without the consent of the insurance company. He also wrote the insurance company what was decided to be done in the way of leasing the lands, but stated that lessee only wanted to pay a nominal consideration therefor, and the company refused to consent to the lease.

The lease contract was made, and appellants also purchased some timber, Donnahoe not knowing it was included in the mortgage at the time, and being told by him that he wanted the purchase money of the timber to pay on the mortgage debt.

Wallin, an appellant, testified that no mistake was made in drawing the lease contract; that he made no agreement in consideration of the lease to pay any amount due the mortgagee if Donnahoe made default in payment, but he was given the right to make such payment, if he cared to exercise it, as provided in the lease; stated that in February, 1924, prior to filing the suit, he had several conversations with S. D. Donnahoe and his son, F. C., relative to the notes in question, and, when he ascertained that the insurance company was going to foreclose its mortgage, he asked Donnahoe about it, and he told him it was a fact. He then said: "Now, in the event of the foreclosure you fellows have some of my

notes. In fact, I have already paid you three years in advance, given you cash for three years, and you got the notes for the fourth and fifth years. If you are going to be foreclosed, I think you will agree that it would be nothing but right to give me these notes. And he, Forrest, said that was all right, they would fix that up all right. Then I got hold of the old man and we talked about it, and he said, 'I do not want to give those notes up right now, but do not worry about the notes, because you have already paid us the cash, and if they foreclose you will lose two years, and you need not worry about the notes; if they foreclose we will not worry you about the notes.' I asked him if they had the notes, and he said, 'Yes, we have them, they are all right; you need not worry about the notes.' I went back to them the second and third time, and talked to both of them the last time, and never got the notes, but they admitted they had the notes at that time, and I did not file this suit until after they told me they had the notes and refused to give them back to me.'' Said the timber contract and the lease were entirely separate matters, neither dependent upon the other, and that Donnahoe, after showing him a letter from the mortgagee insurance company relative to the lease, said he would take the money paid by him, $1,320 cash, and pay it on the interest and loan due.

The trade was made in the fall of 1923. Witness did not talk with Donnahoe nor his son about returning the notes until the foreclosure suit was filed, and never had a conversation with Blair about them. That Davis, his partner, never had anything to do with any of the negotiations. Stated his conversations about the contract were with Donnahoe and his son, sometimes with each and sometimes with both. That, after the foreclosure of the mortgage, he leased the lands from the Missouri State Life Insurance Company, which purchased them under the sale, and paid them the same amount of rent yearly that he had agreed to pay Donnahoe.

Donnahoe testified that he had had two or three talks about the business with Wallin, and first told him he could not let him have the lands, as the insurance company would not consent to the lease, and he told Wallin it could not be done. "Later we talked about it again, and he went to an attorney and had the contract fixed up to suit himself," and witness said: "Get a lawyer, I want it done right." He also told him he was to take his place if he fell down. Said he showed the insurance company's letter to Wallin, and told him that there was a way they could fix this, and to go see a lawyer and make a contract, and he did that. He employed W. B. Scott. Said he regarded the two papers as one contract, and they called for some notes, which he had delivered to Blair some time the latter part of July, 1924. That he had had a conversation with Wallin shortly after he made the contract, and told him that he might have to use the two notes, and he replied "All right, my notes are good." Said the timber contract had nothing to do with the lease contract. That he read them over and signed both, and did not know of any misunderstanding. "I saw Mr. Blair before making the contract. * * * He advised me about the contract. * * * I suppose he knew at the time I traded him the notes that they were the notes Wallin gave on the lease. * * * The consideration Mr. Blair paid for the notes was that he had been attending to my business for a long time. We had had no settlement, and he was pushing me and wanted a settlement, and I told him I was not able to pay anything, and was a sick man, and he said he could take the notes and wait longer, and that was how we traded. I do not know if Mr. Blair has ever rendered me any statement. Probably he has mentioned some debts that have been running along that I owed him." Witness could not remember the amount of any particular service charged for nor any particular service rendered, nor how much he had ever paid Blair, his attorney, nor that he had ever been furnished a statement of the charges by Mr. Blair.

The lease contract shows the consideration to be paid as $320 a year; that $960 cash was paid for the first three years of the term of the contract, beginning January 1, 1924, rent for the years 1924, 1925 and 1926, the balance to be paid yearly in advance for the remaining two years by two notes being given for the balance of the rent.

F. C. Donnahoe testified that he had been attending to his father's business for about 25 years; knew of the contract with Wallin and Davis, and when it was made. Told Wallin to see his father about it. Witness went to see Mr. Blair to see if they had a right to do this, because there was a loan on the place, and Mr. Blair said we could not, and witness had him to write the loan company a letter, and showed the reply to Wallin and his father, both of whom said it looked like they had a right to do it. His father said he wanted to get a contract that would take care of him and the company, and that, if he should fail, Luther Wallin would back the proposition up. The timber and the lease contract was one trade. "Mr. Wallin had the contracts drawn by W. B. Scott. It was one entire contract that was made for the timber and another for the lease and right-of-way." Told Mr. Wallin that Blair had advised they had no right to sell the timber or lease the right-of-way. Showed him the letter from the insurance company written to Mr. Blair; could not find the letter now. The letter was shown to Wallin prior to the execution of the contracts. Admitted signing the contracts in the name of his father. Said there were two notes signed, which they traded to Mr. Blair between the first and tenth of July, 1924. He had heard a conversation in which his father told Mr. Wallin that they might have to use the notes. Said he transferred the notes to Mr. Blair because they owed him $500 for attending to his father's business, and he was pushing them. Blair had been attending to his father's business ten or twelve years, and "had never paid him anything, except $25 at one time. We have had no statement that Mr. Blair ever ren-

dered, but knew that we owed him something." Witness was not able to specify any particular business attended to by Blair. Said "Mr. Blair told us we could not lease that place. We submitted the contracts to Mr. Blair as they were written. He looked them over and told us they were all right. Saw the contracts about five hours after they were signed."

Blair stated that he was attorney for S. D. Donnahoe, and had been for several years. Was consulted by him about the contract with Wallin and Davis, and knew of the mortgage of the Missouri State Life Insurance Company on the land. Advised Mr. Donnahoe that he could not make a contract that would be good without the consent of the company, and wrote them a letter about it. Denied ever having seen the lease and timber contract until after the suit was filed. Said that Donnahoe was mistaken about showing them to him. Could not tell exactly the amount Donnahoe owed him for services; had never kept a strict book account, Donnahoe being a good friend of his. Knew the condition of his business, and had been paid very little money, $25 at one time. Had no certain recollection of particular transactions, but said that he agreed to pay him the $500 in June or July, 1924, and traded him the Wallin notes about the last of June or the first of July, before this suit was filed.

Cross-examination: "I knew all about the contracts. I never did render Donnahoe a statement of his account, but told him from time to time. I knew they were hard pressed, and they were good friends of mine, and I was not pressing them, but, when I saw he was going down, I tried to get some compensation for my services, and I think $500 was a very small amount."

The sale of the timber had been discussed with him, but he could not remember whether it was before he had written the letter to the insurance company in December, 1923.

\* \* \* "I was not in Earle the day the contract was drawn. I presumed the contract would be recorded,

and it would be an act which would warrant the loan company in foreclosing the mortgage. Mr. Wallin wanted the timber, and did not want the loan company to know. That is the reason I took the notes; I did not think he would come into a court of equity and ask that this contract be canceled. Mr. Donnahoe told me about the lease contract.''

The appellee had the right, of course, to lease the lands to appellants, subject to the lien of the insurance company's mortgage, and it had the right to foreclose in default of the payment of the money secured, and the parties certainly intended, as shown by the terms of the lease, that it should run for the full term, as it would necessarily have done, had the mortgagor, Wallin's lessor, paid the amounts due to the mortgagee, as agreed.

A covenant of quiet enjoyment was necessarily implied in the contract for leasing the lands, and there is no question but that the mortgage was foreclosed and the tenant deprived of the possession under the lease, which was determined by the foreclosure, the purchaser becoming entitled to the subsequently accruing rents from the lessee, requiring them to be paid to it, as it had the right to do. *Pickett* v. *Ferguson,* 45 Ark. 177, 55 Am. Rep. 545; *Fitzgerald* v. *Beebe,* 7 Ark. 310.

The undisputed testimony shows that the lessee was deprived of the lands for two of the years for which he had paid the cash rent in advance, and had to pay the purchaser for their use for the two years 1927 and 1928, for which he had given rental notes to Donnahoe at the time the lease was made.

The testimony is also undisputed that all of the parties, Blair included, knew the terms of the lease, and all knew of the foreclosure of the mortgage and sale and purchase of the lands by the insurance company, which took possession of same long before the expiration of the three years of the five-year term for which the rent was actually paid in advance in cash.

The testimony shows that Blair knew the terms of the lease, the eviction of the tenants under the foreclosure

sale long prior to the time the two last mentioned notes became due, and of the failure of the consideration of these notes on that account, before he traded for them in payment of a past due indebtedness, the items constituting which he seemed to have a very hazy recollection of. Having this knowledge of both the terms of the lease and the notes, he took them because, as he said, Wallin wanted the timber and did not want the loan company to know it, and he did not think that he would come into a court of equity and ask that this contract be canceled. Blair admitted he knew for what the notes were given and that the mortgage had been foreclosed, depriving Wallin of the possession under the old lease, compelling him to pay rent to the new owner and landlord. In other words, he took the notes knowing all of the circumstances at the time showing that the consideration therefor had failed, and was not a *bona fide* holder, since he must be charged with the notice of the defenses thereof. Tiedeman on Commercial Paper, §§ 279-299; *Old National Bank of Ft. Wayne* v. *Marcy,* 79 Ark. 149, 95 S. W. 145, 9 Ann. Cas. 339; *Jones* v. *Jackson,* 86 Ark. 191, 110 S. W. 215; *Hogg* v. *Thurman,* 90 Ark. 93, 117 S. W. 1070, 17 Ann. Cas. 383; and *Bank of Monette* v. *Hale,* 104 Ark. 388, 149 S. W. 845.

In *Simmons National Bank* v. *Dilley Foundry Co.,* 95 Ark. 368, 130 S. W. 162, the court said: "Before one can become a *bona fide* and innocent purchaser of commercial paper, it must appear that it was acquired without notice or knowledge of defenses or circumstances which would put him on inquiry." See also *Morehead* v. *Harris,* 121 Ark. 634, 182 S. W. 521, and *Little* v. *Arkansas National Bank,* 113 Ark. 72, 167 S. W. 75.

"This notice of a defense to the note or its infirmity affects the good faith of the purchaser, and deprives him of the vantage ground and security of an innocent purchaser." *Thompson* v. *Love,* 61 Ark. 81, 32 S. W. 65.

"One who purchases a note with notice that his assignor is under obligation to make title to certain land when a series of notes for purchase money is paid, takes subject to such obligation." *Cunningham* v. *Toye,* 97 Ark. 537, 134 S. W. 962.

Blair, having become the holder of these notes under such conditions and circumstances as to be charged with notice of the defenses thereof, is deprived of the vantage ground and security of an innocent purchaser, and is in no better position than the first holder of the notes would have against the defense of failure of consideration.

The chancellor erred therefore in holding that the notes were not subject to cancellation in the hands of Blair, unless he was holding the same as the property of Donnahoe, and should have decreed a cancellation of both notes in the entire amount thereof, because of the established defense of failure of consideration, instead of a partial cancellation.

For the error designated the decree is reversed, and the cause remanded with directions to render a decree for the cancellation of the notes in full, in accordance with this opinion.