McCollum *v.* Graber.

4-7484 184 S. W. 2d 264

Opinion delivered December 11, 1944.

*W. Leon Smith,* for appellant.

*Langdon R. Jones,* for appellee.

McFADDIN, J. Frank McCollum, as plaintiff, filed action against appellees, as defendants, to recover the amount of $238, the proceeds of a U. S. government check alleged to have been stolen from the plaintiff, and cashed by the defendants, who in turn received the money

thereon from the U. S. Government. At the conclusion of all of the evidence, the trial court instructed a verdict for the defendants. Should the court have submitted the case to the jury? That is the only question involved on this appeal.

The rule is well established that in determining on appeal the correctness of the trial court's action in directing a verdict for the defendant we take that view of the evidence most favorable to the plaintiff. *LaFayette* v. *Merchants Bank,* 73 Ark. 561, 84 S. W. 700, 68 L. R. A. 231, 108 Am. St. Rep. 71; *Brigham* v. *Dardanelle Railroad Company,* 104 Ark. 267, 149 S. W. 90; and see many other cases collected in West's *Arkansas Digest,* ''Appeal and Error,'' § 927 (7). With this rule in mind, we give the plaintiff's version of the facts:

On February 28, 1943, check for $238 was issued by the Treasury Division of the United States, drawn on the Treasurer of the United States, payable to ''Mary Pepple, Pascola, Mo.,'' and stating: ''Object for which drawn: Veterans' Administration.'' Mrs. Mary Pepple, who lived 125 yards from the store of appellant in Pascola, Missouri, indorsed the check and received the full amount of money on the check from the plaintiff on March 2, 1943. There were no banking facilities at Pascola. The next day while the plaintiff was making a list of various checks to take to Kennett, Missouri (his banking point), he was called from his office for a moment, and when he returned the check was gone. It was stolen in his absence. At that time it bore only the indorsement of Mary Pepple. Immediately after the discovery that the check had been stolen, plaintiff notified the Government in an endeavor to have payment stopped. Neither Mary Pepple nor anyone for her, nor the plaintiff nor anyone for him, ever transferred or delivered the check to the defendants or anyone for them. The fact that the check was stolen from the plaintiff is not controverted. The trial court so stated.

The defendants, trading under the firm name of Graber's Department Store, are engaged in business in Blytheville, Arkansas, some twenty-five miles from

Pascola, Missouri. At the times herein involved the Government was building near Blytheville an airport and other facilities for the war effort; and the government paydays were the first and fifteenth of each month; and the defendants cashed many government checks at the store after banking hours. On March 8, 1943, the defendants cashed the check here involved, without requiring the holder to indorse the check or be identified in any way, although there was a sign furnished by the U. S. Government hanging over the cash register in the defendants' store, and warning that all persons presenting checks should be identified. When the defendants cashed the check, it contained only the indorsement of Mary Pepple. Such was the plaintiff's case. The defendants claimed in defense that they were holders in due course, and were therefore protected.

Before reviewing the testimony of the witnesses (and there were only two) for the defendants, we state some of the applicable legal principles. Arkansas adopted the Uniform Negotiable Instruments Law by Act No. 81 of 1913, as now contained in § 10152, *et seq.* of Pope's Digest. Section 10213 of Pope's Digest is § 55 of the Negotiable Instruments Law, and reads:

*"When title defective.* The title of a person who negotiates an instrument is defective within the meaning of this act when he obtained the instrument, or any signature thereto, by fraud, duress, or force and fear, or other unlawful means, or for an illegal consideration, or when he negotiates it in breach of faith, or under such circumstances as to amount to fraud."

Section 10217 of Pope's Digest is § 59 of the Negotiable Instruments Law, and reads:

*"Who deemed holder in due course.* Every holder is deemed *prima facie* to be a holder in due course; but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as holder in due course. But the last-mentioned rule does not apply in favor of a party who

became bound on the instrument prior to the **acquisition** of such defective title.''

In 8 Am. Juris. 331 *et seq.*, the general rules on theft of a negotiable instrument are stated as follows:

''*Theft generally.* It is familiar law that one in possession of chattels by theft can convey no title to an innocent purchaser. Coin and bank bills are excepted from this rule, however. As to those, even if feloniously obtained, the holder can convey a good title to an innocent purchaser. From the highest considerations of public policy and of commercial necessity, the law also excepts from the rule negotiable instruments acquired for value in good faith before maturity and without notice. Such paper takes the place and performs, to a large extent, the office of money. It is used for the transaction of much the largest part of the business of mankind. It would be embarrassing, therefore, if every taker of such paper was bound, at his peril, to inquire into the title of the holder, and if he was obliged to take it with all the imperfections and subject to all the defenses which attach to it in the hands of the holder. It has, therefore, become settled by force of considerations such as these that a thief or any other person having possession of such paper fair upon its face can give a holder in due course a good title to it, against all the parties thereto, as well as the true owner. Consequently, the well-settled rule of law is that the transfer of stolen negotiable paper, indorsed in blank or otherwise negotiable by delivery, to a *bona fide* purchaser, for value, without notice and before maturity, vests in him a title good against all the world. This is the rule both at common law and under the Negotiable Instruments law. . . . (p. 331).

''. . . If circumstances exist as to the purchaser of stolen paper which are calculated to raise suspicion in the mind of a man of ordinary prudence and discretion, such a purchaser will be prevented from acquiring title better than that of his vendor . . . (p. 332).

''. . ., the transferee of lost negotiable paper must, to acquire valid title thereto, have both paid a valu-

able consideration and taken it *bona fide*; if circumstances exist which are calculated to raise suspicion in the mind of a man of ordinary prudence and discretion, the purchaser of such paper will be prevented from acquiring better title than that of his vendor." (p. 334) ; see, also, 10 C. J. S. 1117, § 507.

In the *Uniform Laws Annotated,* published by Edward Thompson Company, in the title on "Negotiable Instruments" (vol. V, part 2, p. 229, *et seq.*) there are annotations on § 59 of the Uniform Negotiable Instruments Law. In Note 52 on page 247 under the subject of "Theft," there are cases from numerous jurisdictions to sustain the general rule that proof of theft shifts the burden of proof to the holder to prove that he, or someone under whom he claims, acquired the title as a holder in due course, *i. e.,* for value and in good faith.

In *Daniel on Negotiable Instruments,* 7th Edition, §§ 1731-1732 the rule is stated:

"Section 1731. *How title may be acquired from thief or finder.*—Although the robber, or finder of a negotiable instrument, can acquire no title against the real owner, still if it be indorsed in blank, or payable or indorsed to bearer, a third party acquiring it from the robber, or finder, *bona fide,* for a valuable consideration, and before (but not so, if after) maturity, without notice of the loss, may retain it as against the true owner, upon whom the loss falls, and enforce payment by any party liable thereon; upon the principle that whenever one of two innocent persons must suffer by the act of a third, he who has enabled such third person to occasion the loss must sustain it. And it is now settled in England and in the United States that even gross negligence on the part of such *bona fide* holder in receiving the instrument does not impair his title, nothing short of *mala fides* impeaching it. Not only does the *mala fide* transferee or holder of a negotiable instrument acquire no right to enforce payment, but the loser may at once hold him liable in an action of trover · or assumpsit, or for money had and received. . . .

"Section 1732. *Presumptions as to bona fide ownership of lost bills and notes.*—Some doctrines of evidence remain to be stated. The legal presumption is that the holder of a note is not a finder or thief, but a *bona fide* transferee for value. When, however, the loss by the original owner, or the theft from him, is proved, the burden of proof shifts, and the holder must show that he acquired it *bona fide* for value, and before maturity, or from some one who had a perfect title. . . ."

From these authorities,—and with the theft of the check from the plaintiff being uncontroverted,—the law is: that the thief had a defective title (§ 10213, Pope's Digest), and the burden was on the defendants (under § 10217, Pope's Digest) to prove that they were, or the person from whom they acquired title was, a holder in due course, *i. e.*, for value, before maturity, and *bona fide*.

Cases are cited to the effect that where proof is adduced that the holder acquired the negotiable note before maturity for a valuable consideration, the burden proving lack of *bona fides* is on the opposite party. Such cases are: *Metropolitan Discount Co.* v. *Fondren,* 121 Ark. 250, 180 S. W. 975; *Hamberg* v. *Ahrens,* 118 Ark. 548, 177 S. W. 14; *Conqueror Trust Co.* v. *Reves Drug Co.,* 118 Ark. 222, 176 S. W. 119; *Williamson Bank & Trust Co.* v. *Miles,* 113 Ark. 342, 169 S. W. 368; *Pinson* v. *Cobb,* 113 Ark. 28, 166 S. W. 943; *Bank of Monette* v. *Hale,* 104 Ark. 388, 149 S. W. 845; *Holland Banking Co.* v. *Haynes,* 125 Ark. 10, 187 S. W. 632; and *Rose* v. *Spear,* 187 Ark. 168, 58 S. W. 2d 684. But in none of these cases had there been any theft of the paper involved. There is no impairment of these cases in following, as we now do, the rule that where theft is shown, the burden is on the holder to show both valuable consideration and *bona fides*.

With this burden on the defendants, we point out that in *Uniform Laws Annotated, (supra)* vol. 5, part 2, p. 247, the rule is stated that if the testimony of the holder to his purchase in good faith "is uncontroverted, and there are no circumstances tending to raise suspicion of its truth, the direction of a verdict in favor of the

holder is proper." So the questions then become: (1) whether the testimony offered by the defendants as to their purchase in good faith was uncontroverted, and (2) whether there was an entire absence of circumstances tending to raise a suspicion of the truth of the testimony supporting the defendants. Unless these two essentials concurred, the case should have gone to the jury.

We come, then, to the testimony offered on behalf of the defendants (appellees). There were two witnesses: (1) Mrs. (Miss) Marie Holthoff, and (2) the defendant, Meyer Graber. The sum total of the lady's testimony was that she was working in the store when the check was cashed, and that Meyer Graber paid $238 for the check, and it had the name of Mary Pepple indorsed on it. The witness did not remember whether a man or a woman presented the check, or whether any questions were asked, or whether the witness noticed the address of the payee to be Pascola, Missouri, or where that town was located: just the name, Mary Pepple, impressed the witness, and that was all that she could remember.

The testimony of Meyer Graber was the testimony of a party to the action, and is always considered as contradicted. *Skillern* v. *Baker*, 82 Ark. 86, 100 S. W. 764, 118 Am. St. Rep. 52, 12 Ann. Cas. 243; *Holland Banking Company* v. *Booth*, 121 Ark. 171, 180 S. W. 978. Furthermore, Graber had no more light to throw on the acquisition of the check than did the lady who testified; for this question was asked Graber, and answer made by him as follows:

"Question: As far as you know, you or none of your employees undertook to find out who Mary Pepple was or why she was down here from Pascola, or where Pascola was, or whether that was the proper party, and you don't know whether a man or a woman cashed it?

"Answer: No, sir."

Graber had first advised the court, in a motion for continuance, that he personally knew nothing about the cashing of the check, and that a Mrs. Hanna was the employee who had cashed the check. When continuance

was refused, then Graber remembered that he had cashed the check. All this was presented to the jury as an impeachment of the testimony of Meyer Graber. In the case of *Holland Banking Company* v. *Booth, supra,* Mr. Justice Wood, speaking for this Court, quoted with approval from *Skillern* v. *Baker, supra,* as follows:

" 'It may be said to be the general rule that where an unimpeached witness testified distinctly and particularly to a fact and is not contradicted, and there is no circumstance shown from which an inference against the fact testified to by the witness can be drawn, the fact must be taken as established and a verdict directed accordingly, is inapplicable where the witness is interested in the result of the suit, or facts are shown which might bias his testimony, or from which an inference might be drawn unfavorable to his testimony or against the fact testified to by him. Then the case should go to the jury.' "

This Arkansas case is in accord with the well-settled line of authorities. In *Uniform Laws Annotated,* "Negotiable Instruments," vol. 5, part 2, p. 253, the rule is stated:

"Where the holder's denial of notice is contradicted by suspicious circumstances, the question of good faith is for the jury, although there is no direct evidence of notice." See Annotation on "Directing Verdict on Interested Testimony," 72 A. L. R. 64.

We, therefore, conclude that the trial court erred in instructing a verdict for the defendants, and that the cause should have been submitted to the jury. Reversed and remanded.

Robins, J., dissenting. I respectfully dissent from the majority opinion in this case.

The check involved in this case was properly indorsed by the payee thereof. There was no restriction in the indorsement. It therefore became in effect a check payable to bearer, and everyone had a right to deal with it as such. *Sterling & Snapp.* v. *Bender,* 7 Ark. 201, 44

Am. Dec. 539; *Williamson Bank & Trust Co.* v. *Miles,* 113 Ark. 342, 169 S. W. 368, and since appellees paid full face value for the check before it was presented to the United States Treasury for payment, we have here a purchase for value of a negotiable bill before maturity. (*Bull* v. *First National Bank of Kasson,* 123 U. S. 105, 8 S. Ct. 62, 31 L. Ed. 97; Story, Promissory Notes, § 491.) The burden was shifted upon appellant to show that appellees had notice of some kind as to the infirmity of the title of the one who sold the check to appellees.

In the case of *Conqueror Trust Co.* v. *Reves Drug Co.,* 118 Ark. 222, 176 S. W. 119, this court said through Justice Wood: "The court erred in not directing a verdict in favor of the appellant. The uncontroverted evidence showed that the appellant was an innocent purchaser of the notes sued on. The appellant established the fact by its evidence that it paid a valuable consideration for the notes before their maturity and without any notice of any fraud in their execution or of any defenses that the makers thereof might have against the payee. *This shifted the burden to the appellee to show that the appellant was not an innocent purchaser.* (Italics supplied.) *Pinson* v. *Cobb,* 113 Ark. 28, 166 S. W. 943; *Bank of Monette* v. *Hale,* 104 Ark. 388, 149 S. W. 845. The appellee did not meet this burden, and there were no circumstances developed in the testimony on behalf of the appellant that would warrant a conclusion that appellant was not an innocent holder of the notes. The circumstances did not even create a suspicion of that kind."

In the case of *Holland Banking Co.* v. *Haynes,* 125 Ark. 10, 187 S. W. 632, it was said: "When the holder of a negotiable instrument shows that he purchased it before maturity in the usual course of business for a valuable consideration, a *prima facie* case is made and the burden of proof shifts to the defendant who alleges it to prove that the purchaser had notice or knowledge of such facts as required him to take notice of the defense existing in favor of the makers. *White* v. *Moffett,* 108 Ark. 490, 158 S. W. 505; *Keathley* v. *Holland Banking Co.,* 112 Ark. 608, 166 S. W. 953."

The rule was thus expressed in the case of *Hamburg Bank* v. *Ahrens,* 118 Ark. 548, 177 S. W. 14: "The burden was upon appellees to show after the testimony disclosed that Doyle had purchased the notes for value before maturity that he had such notice of failure of consideration as would prevent his being a *bona fide* purchaser, the presumption otherwise being that he was a purchaser in good faith without notice. *Harbison* v. *Hammons,* 113 Ark. 120, 167 S. W. 849; *Little* v. *Arkansas National Bank,* 113 Ark. 72, 167 S. W. 75."

We said in the case of *Metropolitan Discount Co.* v. *Fondren,* 121 Ark. 250, 180 S. W. 975: "The burden was upon the plaintiff, of course, to show that it paid value for the paper (a negotiable bill), and then the burden shifted to the defendants to show that plaintiff purchased with notice of defects or such information as would put the purchaser upon notice. *Tabor* v. *Merchants National Bank,* 48 Ark. 454, 3 S. W. 805, 3 Am. St. Rep. 241; *Arkansas National Bank* v. *Martin,* 110 Ark. 578, 163 S. W. 795."

In the case of *Cruce* v. *Dillard,* 203 Ark. 451, 156 S. W. 2d 879, we said: "The burden was on appellants to show that appellee took the note either with actual knowledge of its infirmity or defect, or knowledge of such facts that his action in taking it amounted to bad faith. . . . Appellants did not meet this burden. All they did was to show that the note had been procured from them by Thomas through fraud and misrepresentation, that appellee stated to some of them that Thomas was a crook. This was not sufficient."

Now there was nothing whatever in the testimony that can be construed as showing that appellees had any knowledge of the theft of this check or of any suspicious circumstances surrounding the transaction. The majority refers to apparent inconsistencies in the testimony of appellee Graber, and to the fact that, since he was a party, his testimony should not be treated as undisputed. But his entire testimony may well be disregarded, because, in reality, he did not know and did not claim to

know the actual facts surrounding the cashing of the check. Miss Holthoff, appellees' clerk, testified: "A. Of course quite a bit of government business was going on, as everyone knows, and the banks are never open in the late afternoon and usually they bring the checks to the store to get them cashed and we would cash them there out of the change in the register. Q. When this check was presented there and cashed at that store, was there quite a few government checks being cashed that day? A. Yes, sir. There was a line of people waiting to get checks cashed at that time. Q. Was part of that government check circulation due to the airport construction at that time? A. Yes, sir. Q. At the time you cashed this check, did you have any notice that this check had been stolen or there was any defect in the title of the person presenting this? A. I did not. Q. How much of Graber's Department Store's money did you give for this check? A. $238."

Thus we have here the uncontradicted testimony of a disinterested witness that the full face amount of the check was paid for it, and this, in my opinion was sufficient, in the absence of any testimony showing that appellee had notice of the invalidity of title of the person from whom he bought the check, to discharge any burden cast upon appellee to show a good faith purchase of the check. There was not the slightest intimation in the testimony of any witness, nor in any of the circumstances surrounding the transaction, to show that appellees purchased the check in bad faith or with any notice of its theft.

Retail merchants cash a large number of checks for their customers and, in the very nature of things, they do not have an opportunity to investigate the title of the holder of each check. They could not carry on their business and do this. The fact that the merchant may not know the holder of a check is not enough to show bad faith on the merchant's part—especially when the check, as was this one, is payable to bearer. In the case of *Rose* v. *Spear,* 187 Ark. 168, 58 S. W. 2d 684, it was shown that certain bearer bonds aggregating in face value $4,500,

were obtained by fraud amounting to a theft from Rose who owned them. The wrongdoers took the bonds to a gambling house in Hot Springs, Arkansas, where they borrowed $1,000 on them from Spear. Spear did not know the men who hypothecated the bonds, but had seen them playing in the gambling house before that time. The owner of the bonds sought to recover them from Spear, but this court held that Spear was an innocent holder for value and allowed him a lien thereon for the money he had loaned. If a man in a gambling house can take over stolen bonds from utter strangers and be held to be an innocent holder, it seems to me that a legitimate business man who, in the regular course of business, pays full face value for a bearer check, should not be held to be in a worse position.

The commerce of this country is largely carried on through checks, and these checks—especially those of the United States Government—pass as current funds, and, in my opinion, the holding of the majority, which in effect seems to indicate that one who cashes a bearer check must make some investigation of the title of the holder thereof, or, at least, must be in a position to convince a jury that he acted prudently in buying the check, imposes a new and uncalled for burden on those who carry on the mercantile business of the nation.

I am authorized to state that Mr. Justice HOLT joins in this dissenting opinion.