## FARM BUREAU INSURANCE
### Company of Arkansas, Inc. *v.*
### Betty Milligan WARD

75-79                                    528 S.W. 2d 910

Opinion delivered October 20, 1975
[Rehearing denied November 24, 1975.]

*Hodges, Hodges & Hodges*, by: *David Hodges*, for appellant.

*Wilson & Grider*, for appellee.

CONLEY BYRD, Justice. In a suit brought by Betty Milligan Ward under the vandalism provision of an insurance policy issued by Farm Bureau Insurance Company, Inc., the jury found the issues in favor of Farm Bureau. The trial court granted a new trial on the basis that there was no evidence to justify an instruction on whether Betty Milligan Ward had violated the terms of the policy in neglecting to use reasonable means to save and preserve the property at and after the loss. The Farm Bureau appeals from that ruling.

Mrs. Ward for her cross-appeal contends that the trial court erred in not directing a verdict in her favor on the liability of the Farm Bureau.

The record shows that in early 1973, Betty Milligan purchased a house for herself and her three children. The Farm Bureau issued its homeowners policy to Betty Milligan effective from 6/5/73 to 6/5/74. Some three months after the purchase of the house, Betty Milligan married Tommy Ward. Approximately two weeks before the loss involved herein, Tommy Ward left a note saying that he was leaving Betty Milligan Ward and directed her to pack his clothes and put them in his car which was parked outside. Tommy Ward, a long distance truck driver, came to her house with his nephew on the evening preceding March 16, 1974, at approximately 7:00 p.m. Betty Milligan Ward, although in the neighborhood, was not at home at that time. When the children saw Tommy Ward pull the telephone out of the wall, they ran and reported the incident to their mother. After Betty Milligan Ward arrived at her house, Tommy Ward left without speaking. It was then decided that her sister and brother-in-law would spend the night with her. Tommy Ward returned about 2:00 a.m. and when Betty Milligan Ward unlocked the door he slapped her three or four times. Tommy Ward then doubled up his fist to hit her brother-in-law but decided against it and left for the second time. At this time, Betty Milligan Ward and her children, together with the sister and brother-in-law, locked the house and went to the sister's home to spend the remainder of the night. Upon her return the next day Betty Milligan Ward found that Tommy Ward had again returned and broken into her house. There was extensive damage to both the house and the furniture therein.

Jerry Mote, an adjuster for Farm Bureau, testified that the basis of his denial of the vandalism claim was that Mrs. Ward told him that her husband had caused the damage.

The only policy provision involving vandalism or any exclusion or exception thereunder, is under "Perils Insured Against" under Section 1 of the policy. In so far as applicable it provides:

"This policy insures under Section 1 against direct loss to the property covered (and additional living expense resulting from such loss) by the following perils as defined and limited herein:

. . .

10. VANDALISM AND MALICIOUS MISCHIEF, meaning only the wilful and malicious damage to or destruction of the property covered, but excluding as respects this peril loss if the described dwelling had been vacant beyond a period of 30 consecutive days immediately preceeding the loss. A building in course of construction shall not be deemed vacant."

The Farm Bureau in contending that there was evidence warranting an instruction on whether Betty Milligan Ward had neglected "to use reasonable means to save and preserve the property at and after the loss" argues in its brief as follows:

"Therefore, the issue on appeal is whether there was sufficient evidence to sustain the giving of the instruction. What evidence was there of neglect of the insured to use reasonable means to save and protect the property *at* and *after* a loss?

(1) She did not immediately repair the windows and doors.

(2) The repairs described in the estimate have not been made at the time of the trial.

(3) Mrs. Ward unlocked the doors at 2:00 A.M. Saturday morning and let Mr. Ward in the house even though at 7:00 P.M. the previous evening he was violent enough to pull out the phones.

(4) She left the home after the fight wherein Mr. Ward struck her four (4) times. The home was, therefore, unprotected at the time the damage was done by Mr. Ward."

The record at page 76 shows that, when Mrs. Ward discovered the damages, she first notified the police and then Farm Bureau. The property was inspected by Farm Bureau's agents on the same day that the damage was discovered. The only evidence as to any delay in repairs is Mrs. Ward's testimony that she had to wait until she got the money to replace the broken windows and doors. We do not believe that an insurer who refuses payment under its policy is in a position to argue that an insured without the financial means to make the necessary repairs has neglected to use all reasonable means to save and preserve the property. Furthermore, the policy provision upon which Farm Bureau relies provides:

> "This Company shall not be liable for loss by fire or other perils insured against in this policy caused, directly or indirectly, by: . . . (i) neglect of the insured to use all reasonable means to save and preserve the property at and after a loss, or when the property is endangered by fire in neighboring premises; . . . "

There is certainly no showing here that Mrs. Ward, in locking the premises when she left, did anything other than any other prudent person would have done under the same or similar circumstances. Since no loss occurred when Mrs. Ward unlocked the door at 2:00 a.m., we can find no logical relevance to Farm Bureau's contention that this showed a neglect on the part of Mrs. Ward to save and protect the property. Consequently, we agree with the trial court that there was no evidence to instruct the jury on the issue of failure to save and protect the property at and after the loss.

In answer to Mrs. Ward's contention that she was entitled to a directed verdict on Farm Bureau's liability for the damages sustained, the Farm Bureau only contends that there was a factual issue to go to the jury as to what was meant by the words "vandalism and malicious mischief." We find no merit in this suggestion. As can be seen from the language of the policy, *supra*, the terms "vandalism and malicious mischief" are defined as "meaning only the wilful and malicious damage to or destruction of the property covered." The only logical conclusion that can be drawn from

this record is that Tommy Ward, after a quarrel with his estranged wife, returned to the house after she left and wilfully and maliciously broke down the locked door to her house, broke windows and otherwise damaged the personal property therein (including but not limited to breaking the legs from three dining room chairs and completely destroying a color television). Therefore, it follows that the trial court erred in failing to direct a verdict in Mrs. Ward's favor on the issue of liability under the policy.

Reversed and remanded for new trial.

GEORGE ROSE SMITH and FOGLEMAN, JJ., concur.

JOHN A. FOGLEMAN, Justice, concurring. I concur in the result because the circuit judge granted a new trial upon a finding that the jury verdict was against the preponderance of the evidence. The order granting a new trial contained this recital: "The verdict was, without question, contrary to the law and the evidence". It is very easy to see why he thought so. There was no abuse of discretion in granting the motion. Since this is the case, we should go no further, because we have no way of knowing what the evidence will be on retrial. We should particularly avoid holding that under the evidence presented on the first trial, the court should have directed a verdict. If we properly reach the question, and I am not conceding that we should, I do not agree that the court should have directed a verdict for appellee-plaintiff.

A directed verdict for a plaintiff is and should be a rarity. *Hales & Hunter Co.* v. *Wyatt,* 239 Ark. 19, 386 S.W. 2d 704. In order to grant a directed verdict for a plaintiff, the court must find that there is no substantial evidence upon which a reasonable mind could find against the plaintiff on any fact issue. In considering the question all inferences must be drawn and all evidence considered in the light most favorable to the defendant. *Wheeless* v. *Eudora Bank,* 256 Ark. 644, 509 S.W. 2d 532; *Page* v. *Boyd-Bilt, Inc.,* 246 Ark. 352, 438 S.W. 2d 307. The testimony of the plaintiff (or of any party) cannot be considered as uncontradicted or undisputed. *Missouri-Pacific Truck Line* v. *Riley,* 247 Ark. 406, 445 S.W. 2d 720; *McCollum* v. *Graber,* 207 Ark. 1053, 184 S.W. 2d 264.

If there is any question of credibility, it must be left to the jury. On this subject, we had this to say in *Skillern v. Baker*, 82 Ark. 86, 100 S.W. 764:

> It may be said to be the general rule that where an unimpeached witness testifies distinctly and positively to a fact and is not contradicted, and there is no circumstance shown from which an inference against the fact testified to by the witness can be drawn, the fact may be taken as established and a verdict directed based on such evidence. But this rule is subject to many exceptions, and where the witness is interested in the result of the suit, or facts are shown that might bias his testimony or from which an inference may be drawn unfavorable to his testimony, or against the fact testified to by him, then the case should go to the jury. \*\*\*\*

See also, *Sykes v. Carmack*, 211 Ark. 828, 202 S.W. 2d 761.

Before a verdict should be directed for a plaintiff, the facts in issue should be admitted or established by the undisputed proof of disinterested witnesses and different minds should not be able to reasonably draw different inferences from the testimony. *Spink v. Mourton*, 235 Ark. 919, 362 S.W. 2d 665; *Woodmen of the World Life Insurance Society v. Reese*, 206 Ark. 530, 176 S.W. 2d 708.

Even if it should be conceded that the evidence of vandalism met these tests and that appellee was entitled to a directed verdict on that issue, the issue of the reasonableness of her efforts to protect the property involved remains. Appellee was the only witness on that subject, so, even if we consider her as an unimpeached witness, her interest in the result of the suit prevents this court or the trial court from taking her testimony as uncontradicted. Likewise, both the trial court and the appellate court must be able to say that *no* inference unfavorable to the party testifying can be drawn unfavorable to his testimony or contrary to the fact to which he testified. *Sykes v. Carmack*, supra. This certainly would prevent a directed verdict on the issue whether appellee neglected to use all reasonable means to save and preserve the property at and after the loss. It seems to me that the rule governing

treatment of the testimony of a party should have a particularly strong impact where that party's neglect or the reasonableness of his conduct is involved, as it is here. A look at appellee's testimony will show that there are questions whether she did all within her power to protect her property.

Appellee said that her estranged husband came to the house around 7:00 p.m. on Friday evening and was rather upset to the extent that he became violent, but did not hurt anyone or break anything, except for pulling the telephone out of the wall. She stated that she was frightened but, instead of calling any of her family, she called the neighbor she had been visiting when Mr. Ward arrived at the house. According to her, while this neighbor was helping her repair her telephone lines, her sister and the sister's husband arrived and invited her to go home with them, but she preferred that they come and stay with her. Her husband returned to the house at 2:00 a.m. In spite of her knowledge of his previous conduct, she unlocked a door and admitted him to the house. It was then, she said, that he struck her four times and left. She then left and went to the home of her sister and brother-in-law. In spite of the previous episode, she took no precautions other than locking the doors and windows. She did not return to the house until noon the next day, when she discovered the damage, which included a broken out patio door and window. She then went to the police station, but said that the police would not come to the house. A deputy sheriff did come and investigate. She called one Larry Rowland, who investigated the damages. Thereafter, she left and returned to her sister's house. Since the door facing was pulled off, she could not lock the door and she took no precautions about protecting the property in the unlocked house or the premises themselves.

It is true that Mrs. Ward testified that she did not have the money to repair the doors and windows until some time later, but this testimony cannot be taken as undisputed. It is also true that she testified that all the damage had been done when she returned to the house at noon on Saturday. But it is indeed strange that Larry Rowland was not called as a witness by her. There is another circumstance demonstrating that her testimony might be closely scrutinized. On direct ex-

amination, when she knew that appellant was denying liability on the ground that she could not recover if her spouse inflicted the damage, upon being asked if she had any idea who caused the damage, she responded, "No, sir, I don't know who caused it." Later, on cross-examination, she said that she had seen her husband after the incident and that he denied having done it. This testimony came after she had already testified, also on cross-examination, that, at the time, there was no question but what he had done it. She said that when she went to the police she told them he had done it.

Certainly, the question of appellee's credibility was for the jury and it could reject any part of her testimony it found unworthy of belief. Her lack of means to protect or repair the property, whether she took reasonable means to protect the property after the initial violent display by Ward, and whether the full damage claimed was done before she left the unguarded and unlocked house, were all matters for jury consideration.

My concurrence only goes to the remand for a new trial. I would actually affirm the order granting it.

I am authorized to state that Mr. Justice George Rose Smith joins in this opinion.