Argued October 27, 1959, reversed and remanded February 3,
petition for rehearing denied March 1, 1960

# UNION OIL COMPANY OF CALIFORNIA *v.*
# LULL

### 349 P. 2d 243

*David R. Williams,* Portland, argued the cause for appellant. With him on the brief were Williams & Alley, Portland.

*William L. Jackson,* Baker, argued the cause for respondent. With him on the brief were Jackson & Johnson, Baker.

Before McALLISTER, Chief Justice, and PERRY, SLOAN, O'CONNELL, REDDING and KING, Justices.

O'CONNELL, J.

This is an action to recover the value of gasoline and certain automobile accessories, including tires, sold by plaintiff's retail outlets and by associated corporations with whom plaintiff had made arrangements for the use of its credit cards. The purchases were made through the unauthorized use of a credit card issued by plaintiff to defendant. This action is brought on the theory that defendant is liable for such purchases under the terms of a contract which were printed on the credit card issued to the defendant.

The case was submitted to the jury which returned a verdict for the defendant. Plaintiff appeals from the judgment entered in conformity with the verdict.

The credit card which is relied upon by plaintiff as the basis for defendant's liability contained the following conditions, which were printed on the back of the card:

"FORM 786A CONDITIONS

"This card entitles customer to purchase on credit petroleum products, up to five new Firestone or United States tires (passenger size), and other merchandise and services as authorized by Union Oil Company of California at company stations and authorized dealers in California, Oregon, Washington, Idaho, Nevada, Arizona, Utah, Montana, Wyoming, Alaska and Hawaiian Islands, also to purchase petroleum products, up to five new tires (passenger size), battery, lubrication and battery service and tire repairs at stations and dealers of the companies named below:

| | | |
|---|---|---|
| "Gulf Oil Corporation and Gulf Refining Co. | [Trademark Insignia] | Eastern, Midwest, Central & Southern States |
| "Continental Oil Company | [Trademark Insignia] | Midwest, Central & Southern States |
| "The British American Oil Company | [Trademark Insignia] | Canada |
| "Royalite Oil Co., Ltd. | [Trademark Insignia] | Western Canada |

"Deliveries of oil and gasoline shall not exceed the fuel tank and crankcase capacity of the vehicle served. Tires must be mounted on and battery attached to vehicle at time of sale. Deliveries may be made to any vehicle including airplanes (limited to petroleum products only) and pleasure boats.

"The customer to whom this card is issued guarantees payment within 10 days of receipt of statement, of price of products delivered or services rendered to anyone presenting this card, guarantee to continue until card is surrendered or written notice is received by the company that it is lost or stolen. Credit extended hereunder shall be at

the option of the dealer involved. Deliveries may be refused or privilege cancelled at any time without previous notice, and customer agrees upon demand to surrender this card.

"UNION OIL COMPANY OF CALIFORNIA"

The card is used in the following manner. The customer, upon making a purchase, presents the card to the dealer who makes an invoice described as a credit card delivery ticket. In preparing the delivery ticket most filling stations use an imprinter which transfers from the credit card to the delivery ticket the credit card number, the name and address of the card owner, and the expiration date. The imprinter also prints on the ticket the name and address of the dealer making the sale and the date of the sale. The nature of the goods or services sold, the price and the car license number, including the name of the licensing state, are added to the ticket in handwriting. The customer signs his name to the ticket after it has been prepared as described above. One copy of the ticket is given to the customer and one copy is sent by the dealer to the plaintiff's credit card accounting center. There the tickets are key punched and processed through a machine which sorts them by account number from which data the cardholder is billed and the dealer credited each month. More than two million credit tickets are processed by plaintiff each month. Through an exchange agreement with other oil companies plaintiff's cards are honored outside of its marketing area.

The credit card in question bearing the number 593-53-722 had an expiration date of June 30, 1958. The unauthorized purchases were made between April 26, 1958 and May 26, 1958 by a person who was driving a car bearing an Idaho license plate. The

car had been stolen. Fifty-five separate unauthorized purchases totalling $1,454.25 were made during this period through the use of defendant's card. The card was used along the course of the wrongdoer's route extending from Oregon through the southwestern states, thence up through the midwest to Chicago, Illinois. Defendant had made a purchase of gasoline with the same card in Halfway, Oregon on April 24, 1958. He made purchases of Union Oil Company's products in May, 1958 through the use of another credit card issued to him by the plaintiff. This latter card, which bore the expiration date September 30, 1958, was intended as a renewal of the card previously issued, although under the rules adopted by the plaintiff company the use of both cards by defendant would have been proper until the expiration date of the earlier card.

Defendant was not aware of the fact that unauthorized purchases had been made through the use of his card until May 26, 1958, when he received the bill for these purchases together with copies of the credit tickets evidencing the sales. Defendant immediately instructed the plaintiff by telegram to cancel credit card No. 593-53-722.

Defendant testified that he did not know that card No. 593-53-722 was lost or stolen until he received the billing on May 26, 1958. The renewal card replacing card No. 593-53-722 was not mailed by plaintiff company until May 2nd. If defendant had had need for a credit card between the date his earlier card disappeared and the date he received the renewal card, it is probable that he would have noticed that his card was missing. He testified, however, that he had no need for gas during that period. There was some evidence that defendant may have known

as early as the first week in May that the card in question was missing.

██ Defendant argues that he is not subjected to liability by the provisions appearing on the back of the card, relying upon the cases which hold that a person is not bound by the terms of a written agreement if he has no knowledge of such terms and if, because of the manner in which they are embodied in the instrument, a reasonable person would not be led to suspect that the terms were a part of the contract. *May Hosiery Mills v. G. C. Hall & Son,* 77 Cal App 291, 246 P 332 (1926); *Allen v. Southern Pac. Co.,* 117 Utah 171, 213 P2d 667 (1950). See also: *Capitol Automatic Music Co., Inc. v. Jones,* 114 NYS2d 185 (1952); *Hamilton v. Baggage & Omnibus Transfer Co.,* 97 Or 620, 192 P 1058 (1920); *Cutler Corp. v. Latshaw,* 374 Pa 1, 97 A2d 234 (1953); *Lefebvre v. Autoist Mut. Ins. Co.,* 205 Wis 115, 236 NW 684 (1931); *Wussow v. Badger State Bank,* 204 Wis 467, 472, 234 NW 720, 236 NW 687 (1931). In this connection it is pointed out that when the plaintiff invited defendant to make application for a credit card the application form contained no reference to the cardholder's liability for the unauthorized use of the card by another person. Further, it is shown that the conditions limiting the use of the card (which have been set out above) are printed in very small print on the back of a card which is approximately $1\frac{3}{4}$ by $3\frac{1}{4}$ inches in size. Had the issue been properly raised, the foregoing circumstances, together with proof that defendant was not aware of the conditions, would have presented a jury question as to whether the printed conditions constituted a part of the contract. Application of Eimco Corporation, 163 NYS2d 273 (Sup. 1957); *Arthur Philip Export Corp. v. Leathertone, Inc.,* 275

App Div 102, 87 NYS2d 665 (1949); *Kinsman v. Kershaw,* 119 Mass 140 (1875). But the issue was not raised in the pleadings and defendant's evidence did not establish that he was not aware of the conditions printed on the card. Note 63 Harv L Rev 494; 3 Corbin on Contracts 422, § 607. See also *Hanes v. Mitchell,* 78 N D 341, 49 NW2d 606 (1951). In the absence of proof that the terms of the contract were put in deceptive form which would mislead a reasonable person, and that defendant was so misled, he is bound by the conditions of the contract whether or not he read them. 1 Restatement, Contracts, § 70; 1 Williston on Contracts (3d ed) § 90A.

■ It is contended by defendant that if plaintiff intended to hold defendant liable for purchases made by unauthorized persons, the fact should have been brought forcibly to defendant's attention. Plaintiff had no such duty. If we assume, as we must in the absence of evidence to the contrary, that defendant read the contract into which he entered, he is bound by its terms. The sole question is whether the contract is to be interpreted to impose liability upon defendant under the circumstances presented in this case.

■ The contract clearly states that the customer guarantees payment for products delivered or services rendered "to anyone presenting this card" and that this guaranty is to continue "until card is surrendered or written notice is received by the company that it is lost or stolen." Defendant would have us recast the terms of the contract by limiting the cardholder's liability to cases in which he had authorized the use of the card or where, through his fault, the card was used by one not authorized to do so. There is nothing in the transaction between the plaintiff and defendant

which would justify this modification of the conditions clearly expressed on the card.

The trial court took the position that defendant was bound by the provisions on the card, but that he would be entitled to be excused from the performance of the conditions if he acted as a reasonable man in connection with his possession and use of the card and "if, in fact, he gave such notice as a reasonable person would give on discovery of what he discovered, in light of all the circumstances." The jury was instructed that if the notice given to the plaintiff by defendant "was given as soon as a reasonably prudent person under all the circumstances would have given the notice," and that the card was used wrongfully by another person "without Mr. Lull's knowledge or consent, and without any negligence on the part of Mr. Lull in the care, handling and keeping of the credit card," then defendant was entitled to a verdict. We think that this instruction erroneously stated the rights and duties of the parties under the contract. There is no basis for implying the limitation upon defendant's liability.

■ It may be conceded that most persons carrying credit cards are not aware of the liability which the conditions on the card impose upon them in the event that the card is used without authorization by the cardholder. But the fact that there is a widespread misconception on the part of cardholders as to their liability does not warrant us in rephrasing the contract to accommodate that misunderstanding. The plaintiff company was entitled to the terms of its bargain with those who elected to use its credit cards, assuming of course, as we have, that the bargain was fairly made.

The bargain expressed in the provisions of the

card is not an unreasonable one. Plaintiff takes the risk of loss for all purchases made after it receives notice of the loss or theft of the card; defendant assumes the risk of loss prior to such notice. The parties share the risk of loss and the cardholder can minimize his risk by the careful custody of his card and by promptly notifying the company of the card's loss or theft. Therefore, it is our interpretation of the contract that the defendant was not absolved from liability by exercising care in the use and custody of his card and that it was error to instruct the jury as the trial court did.

There are surprisingly few reported cases dealing with the question of a credit card owner's liability for its unauthorized use. In *Jones Store Co. v. Kelly,* 225 Mo App 833, 36 SW2d 681 (1931) there was evidence that the owner of the credit token (a coin in that case) had authorized the use of his token in making the purchase for which recovery was sought. The court said that if the credit token had been used wrongfully the defendant would not be liable. However, this pronouncement is not helpful to us in the instant case because the credit arrangement here included a guaranty agreement broad enough to impose liability upon the card owner for an unauthorized use of the card.

In *Lit Bros. v. Haines,* 98 NJL 658, 121 A 131 (1923) the credit token was stolen from the owner and it was held that he was not liable for purchases made by the thief. There was no agreement imposing liability upon the token owner for purchases other than his own. The court regarded the token simply as an identification piece. The creditor relied upon *Wanamaker v. Megary,* 24 Pa Dist 778 (Mun Ct Phila 1915), which held that defendant was liable for pur-

chases made by a wrongdoer through the use of defendant's credit token, which was lost or stolen, although there was no guaranty agreement between the creditor and defendant and notice of the disappearance of the token was given the day after it was lost. The court likened the credit token to a negotiable instrument payable to bearer and held that the token owner was liable on the theory that she had been negligent in keeping the token in an insecure place. The court in *Lit Bros. v. Haines,* supra, criticized this reasoning, saying:

"* * * This is in our opinion unsound in law, for it rests upon an assumption which an examination of the coin does not warrant, for it has none of the requisites of a negotiable instrument, for title to it cannot pass by delivery like securities payable to bearer, and to give it any more effect than it purports on its face to be, an identification of the person to whom it was issued, there must be some proof that between the issuer and acceptor it was intended to have a further purpose not disclosed on its face." 121 A at p 132.

The theory of the Wanamaker case was also rejected in *Gulf Refining Company v. Plotnick,* 24 Pa D & C 147 (1934) where a thief stole the credit token from the owner's automobile and made purchases of gasoline and oil at plaintiff's service stations. The court held that it was proper to submit to the jury the question of the token owner's liability where there was evidence that the token was stolen through the owner's negligence in leaving the token in his automobile, and where there was an averment that plaintiff "did not use due diligence and ordinary care in ascertaining whether or not the person or persons making said purchases and presenting said courtesy card was or were the defendant or any of his duly

authorized agents, servants or employes." 24 Pa D & C 151.

The owner of a credit card was held liable for unauthorized purchases in *Magnolia Petroleum Co. v. McMillan*, 168 SW2d 881 (Tex 1943). In that case the card was issued to the defendant with the following condition:

> " 'The named holder shall be responsible for all purchases made by use of this card, prior to its surrender to the issuing company, whether or not such purchases are made by the named holder or into the car described.' " 168 SW2d at page 881.

Purchases had been made by others through the authorized use of the card. But other purchases which had not been authorized were made by persons having the rightful possession of the card and it was for these purchases that suit was brought. The court, referring to the language of the guaranty agreement, held that the purchases fell within it. The court pointed out that although defendant had ordered the card returned to him, he did not notify plaintiff that the borrower had refused to do so.

The foregoing cases, together with *Gulf Refining Co. v. Williams Roofing Co.*, 208 Ark 362, 186 SW2d 790, 158 ALR 754 (1945) to be discussed later, are the only cases we have been able to find which deal with the unauthorized use of credit cards or tokens. Annotation, Liability for purchases on credit or "courtesy" card, or on credit or coin plate, 158 ALR 762; Claflin, The Credit Card—A New Instrument, 33 Conn B J 1 (1959). None of the cases exactly fits into the factual situation before us. The theory of liability expressed in *Gulf Refining Company v. Plotnick*, supra, appeals to us as basically sound, i.e., that both the card owner

and the card issuer must show the exercise of care, the former in the custody of his card and the latter in making reasonable inquiry when it is used.

■ We have interpreted the guaranty agreement in the instant case as imposing a risk of loss upon the defendant for sales made through the use of the card prior to receipt of notice by plaintiff that the card was lost or stolen. That interpretation of the contract does not preclude us, however, from considering the scope of defendant's liability, particularly as it is measured by the correlative duties of plaintiff. The contract in question may be classified generally as one of suretyship, guaranty or indemnity. For the purpose of disposing of the problems presented in this case it is immaterial which of these terms would most accurately describe the relationship between plaintiff and defendant. Arant on Suretyship, § 17; Restatement, Security, § 82. For convenience we shall refer to defendant as an indemnitor.

■ In the interpretation of contracts of suretyship, guaranty and indemnity it is frequently held that the promises of the uncompensated surety, guarantor or indemnitor are to be strictly construed, it sometimes being said that such promisors are favorites of the law. *Hagey v. Mass. Bonding & Ins. Co.,* 169 Or 132, 126 P2d 836, 127 P2d 346 (1942); *Title & Trust Co. v. U. S. Fid. & Guar. Co.,* 138 Or 467, 1 P2d 1100, 7 P2d 805, 32 P2d 1035 (1932); *The W. T. Rawleigh Co. v. McCoy,* 96 Or 474, 190 P 311 (1920); Annotation, Liability of surety company as distinguished from that of gratuitous surety, 12 ALR 382, supplemented at 94 ALR 876; Arant on Suretyship, p 140; Simpson on Suretyship, p 94. We think that essentially the same consideration for the uncompensated surety can be realized without indulging in

special rules of construction. According to the better view such contracts are to be interpreted according to the standards that are applicable in the interpretation of contracts in general. Restatement, Security, § 88; 3 Williston on Contracts (Rev ed) § 625. However, in attempting to arrive at the intention of the parties, the acceptance of this latter rule of construction does not prohibit a consideration of the peculiar nature of the bargain which normally characterizes contracts of suretyship, guaranty and indemnity, nor does it preclude a consideration of the particular business setting in which a specific bargain was made. Thus, it is permissible for us to consider that indemnity agreements normally expose the indemnitor to liability through the conduct of others over which he has little or no control. *Southern Pac. Co. v. Layman,* 173 Or 275, 145 P2d 295 (1944). This fact is properly considered in striving to determine the meaning which the parties attached to their bargain.

 In determining the liability of the indemnitor in this case we may consider the fact that he is not engaged in the indemnity business, and therefore without the opportunity to calculate his risks and charge a premium accordingly. The defendant is essentially a gratuitous indemnitor, the only consideration moving to him being the convenience of the use of the credit card. It is to be noted that the plaintiff has likewise received a benefit consisting of adding another potential customer for the sale of its products by facilitating purchases through the convenient use of credit.

The defendant's promise to indemnify plaintiff must be interpreted in light of these respective benefits. *U. S. Rubber Co. v. Silverstein,* 161 NYS 369 (1916); *Belloni v. Freeborn,* 63 NY 383 (1875); Re-

statement, Security, § 88. See Annotation, Liability of surety company as distinguished from that of gratuitous surety, 12 ALR 382, supplemented at 94 ALR 876.

The fact that the indemnitor's control over the conduct of others is lacking or limited and the essentially gratuitous character of the indemnitor's promise are bases for treating the contract as embodying an implied promise on the part of the indemnitee to exercise reasonable diligence to protect the indemnitor in transactions which may create indemnity liability. *Gulf Refining Co. v. Williams Roofing Co.,* supra; *Rector v. McCarthy,* 61 Ark 420, 33 SW 633 (1896); *Piasecki v. Fidelity Corp. of Mich.,* 339 Mich 328, 63 NW2d 671 (1954). It is appropriate to inquire whether this principle is applicable to the present case so as to require the plaintiff, through its agents, servants, or associates, to make inquiry of customers using the plaintiff's credit card concerning their authorization to pledge the cardholder's credit. The duty of the creditor towards his surety is broadly stated in *Glenn County v. Jones,* 146 Cal 518, 520, 80 P 695, 696 (1905), as follows:

> "The contract of suretyship imports entire good faith and confidence between the parties as to the whole transaction. The creditor is bound to observe good faith with the surety. He must withhold nothing, conceal nothing, release nothing which will possibly benefit the surety. He must not do any act injurious to the surety or inconsistent with his rights. He must not omit to do any act required by the surety which duty enjoins him to do, if such omission injures the surety."

The duty owed to the surety "arises not from any contract of the creditor with the surety but from the equities of the situation." *Hamlen v. Rednalloh Co.,*

291 Mass 119, 197 NE 149, 99 ALR 1230, 1236 (1935); *White's Administrator v. Life Association of America,* 63 Ala 419, 35 Am Rep 45 (1879); *Calif. Lettuce Growers v. Union Sugar Company,* 45 Cal2d 474, 289 P2d 785, 791, 49 ALR2d 496 (1955); *Benton County Sav. Bank v. Boddicker,* 105 Iowa 548, 75 NW 632 (1898); Stearns, Law of Suretyship (5th ed), pp 105, 106. Since we think that this principle is of controlling significance in the present case, we wish to examine it more specifically.

■ In a variety of business transactions out of which the liability of the surety, guarantor or indemnitor could arise, the courts have imposed upon the indemnitee a duty to act in such a way as to protect the indemnitor to the extent that it was reasonable to do so under the circumstances. In many of such cases it has been held that there is a duty to make reasonable inquiry where there are circumstances which would prompt a reasonable man to inquire. *Owen and Gutch v. Homan,* 10 Eng Rep 752, 767 (1853); 4 American Law of Property, § 17.11; 1 Merrill on Notice, § 65; 3 Scott on Trusts, §§ 297, 321, 321.2, 324-324.4, 326.1.

Illustrative are the cases in which it is held that a drawee bank may recover for a payment made upon a forged check where the person cashing it did not make reasonable inquiry as to the authority of the person presenting it. The rule is stated in *National Bank of Commerce v. Mechanics' Am. Nat. Bank,* 148 Mo App 1, 127 SW 429 (1910) as follows:

"* * * The so-called modern rule is that one who purchases a check or draft is bound to satisfy himself that the paper is genuine and that by indorsing it or presenting it for payment or putting it into circulation before presentation, he impliedly asserts that he has performed this duty. Con-

sequently it is held in this line of cases that if it appears that he has neglected this duty the drawee, who is without actual negligence on his part and who has paid the forged paper, may recover the money paid from such negligent purchaser." 127 SW at page 433.

In *First Nat. Bank of Danvers v. First Nat. Bank of Salem,* 151 Mass 280, 24 NE 44 (1890), where the defendant cashed a forged check which was drawn on plaintiff and the defendant did not attempt to identify the person presenting it, the court said:

"* * * In the absence of actual fault on the part of the drawee, his constructive fault in not knowing the signature of the drawer, and detecting the forgery, will not preclude his recovery from one who took the check, under circumstances of suspicion, without proper precaution, or whose conduct has been such as to mislead the drawee, or induce him to pay the check without the usual security against fraud. * * *

"* * * It is altogether probable that if the defendant, before it cashed the check, had made proper inquiry, the utterer of it would not have remained to encounter any such investigation; and, if he had, it would readily have been ascertained that he was not the reputable person of the name of 'Joel Kimball' who resided in Danvers." 24 NE at page 45.

The breadth of the duty of one receiving a forged check is seen in *First Nat. Bank of Orleans v. State Bank of Alma,* 22 Neb 769, 36 NW 289 (1888). In that case a stranger presented a check to the cashier of the bank who cashed it only after comparing the signature of the drawer with the genuine signature of the drawer, of which the cashing bank had a copy. The signature on the forged check appeared to be genuine. The cashier cashed the check without re-

quiring identification of the person presenting it. The court held that the loss arising from the payment of the forged check fell on the cashing bank and not the drawee bank. The court said:

"* * * The bank to which the check is presented by a stranger may require his identification and proof that he is the lawful holder of the check. It must take the necessary steps to ascertain the genuineness of the instrument, and the identity of the person presenting it, or, in case of loss from such neglect, will be the party at fault. * * * In this case, had the plaintiff in error required the holder of the check to prove who he was, and the manner in which he came by the check, in all probability he would have declined the ordeal, and the check would not have been paid. The loss, therefore, may be traced directly to the plaintiff's negligence." 36 NW at page 291.

A similar result was reached in *Louisa. Nat. Bank v. Kentucky Nat. Bank,* 239 Ky 302, 39 SW2d 497 (1931). See, *First Nat. Bank v. United States Nat. Bank,* 100 Or 264, 197 P 547, 14 ALR 479 (1921). Other cases may be found in a series of annotations in 12 ALR 1099, 71 ALR 339, 121 ALR 1059.

A case affording a closer analogy to the present case is *Kummel v. Germania Savings Bank,* 127 NY 488, 28 NE 398, 13 LRA 786 (1891). There it was held that a bank was liable for its negligent payment of money out of the depositor's account to a stranger who had stolen the depositor's passbook. The stranger presented the passbook together with a forged receipt or order. The bank made no effort to identify the stranger. An agreement between the bank and the depositor to the effect that the bank would not be responsible for fraud committed on its officers in producing the passbook and thus withdrawing money

without the knowledge or consent of the depositor was held ineffective to relieve the bank from the duty to make inquiry. The court said:

"* * * but this modification [the agreement referred to above] does not permit the officers to carelessly shut their eyes, and pay to any person presenting the pass-book, but, on the contrary, they owe the depositor active vigilance, in order to detect fraud and forgery." 127 NY at page 492, 28 NE at page 399.

Frequently deposits are made pursuant to an agreement between the bank and the depositor providing that the bank shall not be liable to the depositor for payments made to persons presenting the passbook without authority, unless the bank shall have been notified previously in writing by the depositor that the passbook had been lost or stolen. It is held that such an agreement does not relieve the bank from the duty to use due care in attempting to identify the withdrawer in order to protect the depositor from fraud, larceny and forgery. *Commisso v. National City Bank of New York,* 174 Misc 409, 21 NYS2d 187 (1939). And where it is found that the depositor is negligent in not notifying the bank of the loss of the passbook, nevertheless it is held that the bank is not relieved of liability if it fails to exercise diligence in making inquiry concerning the authority of the withdrawer. *Ladd v. Augusta Savings Bank,* 96 Me 510, 52 A 1012 (1902). The rule is stated in *Chase v. Waterbury Savings Bank,* 77 Conn 295, 59 A 37 (1904):

"* * * Even if the plaintiff was negligent, as claimed, that did not excuse the bank officers from exercising ordinary care to prevent one who they knew was not a depositor from obtaining money upon a forged order, nor relieve the bank from liability for payments negligently made to the wrong

person. The question of contributory negligence is not involved in the case. If the bank officers failed to exercise ordinary care in making the payments to Mrs. Keith upon forged orders, the bank was liable to the plaintiff for the sums so paid." 59 A at page 40.

See *Watts v. American Security & Trust Co.,* 47 A2d 100 (Dist of Col 1946) ; *Brown v. Merrimack River Sav. Bank,* 67 N H 549, 39 A 336 (1894) ; *Bloom v. Bank for Savings,* 180 NYS2d 934 (1958) ; Annotation, Printed statement of rules in pass book as affecting rights of bank and depositor, 5 ALR 1203, supplemented at 60 ALR2d 708.

■ Other cases may be referred to which apply the principle that reasonable inquiry must be made as to the status or authority of a person who wrongfully deals with another's goods or credit, purporting to have the right to do so. *Lynn v. Lafitte,* 177 So 83 (La. 1937) ; *Wallich v. Sandlovich,* 111 Neb 318, 196 NW 317 (1923) ; *Employer's L. Assur. Corp. v. Hudson River T. Co.,* 250 App Div 159, 812, 294 NYS 698 (1937) ; *Reif v. Equitable Life Assur. Soc. of United States,* 268 NY 269, 197 NE 278, 100 ALR 55 (1935); *Ambrose v. Huntington,* 34 Or 484, 56 P 513 (1899) ; *Bowman v. Metzger,* 27 Or 23, 39 P 3 (1895); *Richlands Brick Corp. v. Hurst Hardware Co.,* 80 W Va 476, 92 SE 685 (1917). See also, 28 Ore L Rev 258 (1949) ; 34 Ore L Rev 120 (1955). We regard this principle as applicable with particular force where the person whose liability is at issue is an indemnitor who must rely upon others to help him keep his liability within reasonable bounds.

■ We think that the indemnity agreement in the instant case must be interpreted as subjecting defendant to liability for sales made through the un-

authorized use of its credit cards only if due care is exercised by plaintiff, its agents and privies, to ascertain the authority of the customer who presents the card. That duty to make inquiry must of course be fulfilled by plaintiff's agents and servants in making sales through its own service stations. If the card is presented at a service station of an associated company with whom plaintiff has an agreement to make reimbursement for sales made through the use of plaintiff's credit card, then, although the law of agency is not applicable, plaintiff's right to recover for such sales is, nevertheless, no greater than the right of the dealer who made the sale. It is possible to regard plaintiff as the assignee of the dealer's claim against the card owner, in which case plaintiff would take the assignment of the claim subject to the infirmities with which it was encumbered in the hands of the dealer-assignor. 2 Williston on Contracts (Rev ed), § 432.

In *Gulf Refining Co. v. Williams Roofing Co.,* supra, the court applied the foregoing analysis to a factual situation not unlike the one before us. There, a credit card was issued by plaintiff company to the defendant, who wrote across the face of the card "Good for Truck Only." The card was stolen and used by the wrongdoer to acquire various products from plaintiff's dealers. The imposter was not driving a truck at the time the credit sales were made to him. The defendant contended that there was collusion between the impostor and the plaintiff's dealers. In discussing this contention, the court said:

> "One of the defenses offered by appellee is that the various Gulf retail dealers where the impostor used the credit card were the agents of appellant. It is insisted that there was collusion between the

agents and the impostor, and that the knowledge of the agents was the knowledge of appellant. The contract between appellant and the Bradley Service Station, where the credit card was stolen, was introduced in evidence. In the case of Arkansas Fuel Oil Company v. Scaletta, 200 Ark. 645, 140 S.W.2d 684, we held a somewhat similar contract made the dealer an independent contractor. The situation there involved is considerably different from the one here. But even if we so held here, such result would not profit the appellant. If these dealers were independent contractors and not agents of appellant, it necessarily follows that they were assignors of the forged invoices upon which appellant seeks to recover in this suit. These invoices, which were duly assigned by the respective dealers to appellant, were not negotiable instruments. They did not contain a promise to pay to order or bearer and appellant, as assignee, acquired no greater right than his assignors had under our decisions. It is well settled that the assignment of a non-negotiable instrument passes the rights of the assignor subject to all defenses that would be available if the assignor brought suit direct on the instrument. General Motors Acceptance Corp. v. Salter, 172 Ark. 691, 290 S.W. 584; General Motors Acceptance Corp. v. Sanders, 184 Ark. 957, 43 S.W.2d 1087; 6 C.J.S., Assignments § 116, p. 1166. It follows that appellant took the invoices subject to all equities and defenses existing between appellee and the various dealers, although appellant may well be a bona fide purchaser for value without notice of such equities or defenses." 186 SW2d at page 793-4.

We come, then, to the question as to whether in the case at bar there were circumstances in the presentation of the card which would prompt a reasonable man to make inquiry as to the customer's authority to use it. This is a jury question. *Barthelmess v. Cavalier,* 2 Cal App2d 477, 38 P2d 484 (1934); *North-*

*western Portland Cement Co. v. Atlantic Portland Cement Co.,* 174 Cal 308, 163 P 47 (1917); *Everding & Farrell v. Toft,* 82 Or 1, 150 P 757, 160 P 1160 (1916); *Matlock v. Scheuerman,* 51 Or 49, 93 P 823, 17 LRA (NS) 747 (1908); *Bowman v. Metzger,* 27 Or 23, 39 P 3 (1895); 1 Merrill on Notice, § 73. There were sufficient facts in the instant case from which the jury could properly conclude that further inquiry should have been made. The impostor was driving an automobile bearing an Idaho license plate; the credit card showed that Mr. Lull was a resident of Halfway, Oregon. Ordinarily a person registers his car and obtains his license plate in the state of his residence. If he presents to a dealer a card showing a residence in one state and if he is driving an automobile licensed in another state, these facts would seem to be sufficient to suggest to a reasonable person the possibility that the card or the automobile, or both, were stolen. The license number was recorded on most of the sales tickets made out for the sales to the impostor in this case, and thus the disparity between the state of residence and state of licensure was apparent on the face of the card. It would be reasonable for a jury to conclude that this fact should have prompted the service station attendants to make inquiry concerning the customer's identity. If, upon inquiry, the impostor had produced evidence to identify himself as Mr. Lull, and that evidence was sufficient to lead a reasonable man to conclude that the impostor was Mr. Lull, the dealer would be justified in extending credit on the basis of the conditions stated on the card and defendant would be liable for the price of the products so purchased. Ordinarily, adequate proof of identity would be established by the possession of the usual cards carried in a billfold, such as a

driver's license, fishing license, social security card or the like, bearing the same name as that appearing on the credit card. If this cannot be shown and there are no other circumstances from which the dealer can reasonably infer that the customer is the person named on the credit card, the sale is made at the dealer's risk, and the company issuing the card is precluded from recovering against the card owner because, as we have already stated, the company's rights cannot transcend those of the dealer. If the card is presented by a customer who does not claim to be the card owner but claims only that he is authorized to use the card, the dealer assumes the risk of loss on the sale unless he is furnished evidence that would lead a reasonable person to conclude that the claimed authority was given.

We hold, therefore, that plaintiff's right to recover under the guaranty agreement for unauthorized purchases of its products through the use of defendant's credit card is conditioned upon the exercise of reasonable care in making inquiry concerning the identity of the impostor using the card. *Gulf Refining Company v. Plotnick,* 24 Pa D & C 147 (1934).

▮ The burden of proving that reasonable inquiry was made is upon the plaintiff. We can turn to no direct authority for this conclusion. However, a close analogy in the field of negotiable instruments law supports our position. It is well established that if it is proved that a negotiable instrument was lost by the owner or stolen from him, the holder has the burden of proving that he acquired the instrument as a holder in due course. *McCollum v. Graber,* 207 Ark 1053, 184 SW2d 264 (1944); *Harter v. People's Bank,* 221 App Div 122, 223 NYS 118 (1927); *Warren v. Smith,* 35 Utah 455, 100 P 1069, 136 Am St Rep 1071 (1909);

Britton on Bills & Notes, § 104. The analogy is appropriate to suggest only the allocation of the burden of proof. The duty of inquiry cast upon purchasers of negotiable paper differs from that which rests upon the plaintiff's agents and associates here. According to the prevailing view, a person purchasing a negotiable instrument is not "put on inquiry and charged with knowledge of such additional facts as a reasonable inquiry would disclose," (Britton on Bills and Notes, page 462) but we are not dealing with a negotiable instrument in the present case and, as we have made clear above, the duty of inquiry must be discharged by the plaintiff.

Another burden rests upon the plaintiff. It must show that the goods for which charges are made were in fact delivered to the customer using the credit card. *Standard Oil Co. v. Globe Cartage Co., Inc.,* 324 Ill App 520, 58 NE2d 338 (1944); *Jenny Garments, Inc. v. Matassa,* 68 So2d 204 (La App 1953).

The judgment is reversed and the cause is remanded for a new trial.