ALLIED STORES OF NEW YORK, INC., Doing Business as B. GERTZ, Plaintiff, *v.* MARY FUNDERBURKE, Defendant.

Civil Court of the City of New York, Trial Term, New York County, February 23, 1967.

*Miller & Silverman* (*Richard C. Leonhardt* of counsel), for plaintiff. *Joseph List* for defendant.

HAROLD BIRNS, J. The question for decision in this case is whether a person to whom a credit card has been issued shall be liable for purchases to issuer where such holder is unaware of its loss and use by a thief.

Plaintiff, operator of a department store, seeks judgment for $2,460, claiming nonpayment for 237 purchases made in defendant's name during a one-month period in 1965. Plaintiff relies on an application for credit signed by defendant in 1961 whereunder a credit card was issued. By the signed application, entitled "Retail Instalment Credit Agreement (Flexible Charge Account)", the defendant agreed "1.— To pay for all purchases made by any person presenting the identification plate which Seller will lend me, until Seller receives my notice by certified mail that same has been lost or stolen".

Liability is sought to be imposed under sections 511, 512 and 513 of the General Business Law, effective January 1, 1962, whereby the Legislature took cognizance of the wide use and acceptance of credit cards in business and commerce and the losses occasioned by improper and unauthorized use of such cards. It was designed to protect holders and issuers of credit cards against the unknowing assumption of liability for purchases by use of a credit card after its loss or theft by requiring any provision to impose such liability to be written or printed in certain specified fashion, either on the card itself or on a writing accompanying the card when issued, or on an application for the card. In addition, it sought to make ineffective the fine print provisions found on the backs of many credit cards by which issuers of such cards attempt to impose liability on holders for purchases made after loss or theft of the cards, provisions of which the holder is not made aware. (Report of Joint Legislative Committee on Commerce and Economic Development, N. Y. Legis. Doc., 1961, No. 79, p. 58.)

Section 512 provides in part: "A provision to impose liability on an obligor for  *  *  *  use of a credit card after its loss or theft is effective only if it is conspicuously written or printed in a size at least equal to eight point bold type either on a card or on a writing accompanying the card when issued or on the obligor's application for the card, and then only until written notice of the loss or theft is given to the issuer."

With respect to credit cards issued prior to the said effective date, this section continues: "Such a provision either in a credit card issued prior to the effective date of this article, or in a writing accompanying such a card when issued, or in the obligor's application for such a card, is effective on or after the effective date of this article, only if the issuer mails to the obligor, properly addressed, written notice of the provision conspicuously written or printed, in a size equal to eight point bold type."

Among the definitions furnished by section 511 are those of "'Holder' means a person to whom such a credit card is issued and includes an obligor"—defined as "any person who has agreed to pay obligations arising from the use of a credit card issued to him or another person". It is clear that these sections are designed to have retroactive as well as prospective effect. (McKinney's Cons. Laws of N. Y., Book 1, Statutes, §§ 52, 53.)

Prior to enactment and critically noted was the statute's intendment to deal only with certain abuses in the use of credit cards and credit identification devices in public use, most of which, it was observed, provide that the user or obligor is liable for purchases made with the credit card until the issuer receives notice of its loss or theft. (Report of Committee on State Legislation, Association of the Bar, 1961, No. 107, p. 465, Re S. Print 1816, 3722; Int. 1758.) These sections of the General Business Law impose limitations of liability on the credit card obligor for use of lost or stolen credit cards where notice of such theft or loss is transmitted to the issuer. Liability may be imposed only where such notice is not given as required. With prophetic vision it was anticipated: "A serious ambiguity arises, however, with respect to the effect of this provision on any common law liability which might arise in the absence of any contractual provision whatever" (Report of. Committee on State Legislation, *supra*, p. 406).

It has been held that credit card provisions under which the holder assumes liability for all purchases made, even by unauthorized users, are enforcible. (*Union Oil Co. of Cal.* v. *Lull*, 220 Ore. 412.)

But under the credit agreement here, which conforms with section 512, although the plaintiff issuer assumes all the risk of loss or theft after receipt of notice of such facts, the agreement does not expressly provide that the holder assumes all risk occasioned by loss or theft of the credit card where the credit card holder is unaware of such facts and thus is unable to give the required notice.

In this case purchases were made with the defendant's credit card but the defendant was unaware of its loss or theft. Obviously until notified by the plaintiff, as will be seen hereafter, of the purchases made in her name, the defendant was unable to give the notice required by statute and her agreement. Thus the statute as well as the agreement does not precisely meet the problem raised and each "leaves unclear its effect on liability not imposed by any 'provision' in a contract" (Report of Committee on State Legislation, *supra*, pp. 466–467).

It is in this context of statutory and contractual ambiguity that the facts of this case must be analyzed. For a period of four years, the defendant, a dining room attendant at Creedmoor State Hospital, diligently and responsibly paid the bills due and owing on her charge account for purchases made through use of her credit card. Her credit agreement with the plaintiff provided for certain minimum monthly payments to be made by her depending on her monthly balance. At the lowest range of the credit sale, if said balance were between $10 and $80, the minimum payment was to be $10 a month; if between $181 and $200, payment was to be at $40 a month, and over $200, arrangements for monthly payments were to be made with plaintiff's credit office. In addition, under paragraph 3 of the credit agreement, "for all purchases exceeding my approved limit" the defendant agreed to pay at once.

On June 26, 1965 defendant made payment at plaintiff's store and reduced her outstanding balance from $121.36 to $86. It was not necessary for defendant to exhibit her credit card to effect such payment. On June 30, 1965 defendant left New York City to visit her mother in North Carolina, where she remained until she returned on July 13, 1965.

It appears that between June 16, 1965, and July 13, 1965, 237 purchases were made at plaintiff's department store by someone using the credit card issued to defendant. Of this number, 230 were transactions totaling less than $15, the remaining seven were transactions totaling more than $15. Under the procedures in the store, presentation of the credit card would without more allow transactions of less than $15. For

transactions totaling more than that level, some inquiry by the sales personnel was required to be made of the credit department.

It was only upon the defendant's return to New York that, by letter, she was asked to visit plaintiff's store, where for the first time she learned of the said purchases and discovered that her card was lost or stolen.

It appears further that at the end of June, 1965 the charges in defendant's account were in excess of $471.74 and that the last charge against defendant's account occurred on the day of her return.

At the trial the sales slips were examined and the signatures thereon were compared with the signature defendant had placed on her credit agreement in 1961. The defendant denied the sales slip signatures were hers or that she had authorized them. She maintained she never signed her name in the fashion appearing on the said sales slips. Her contention is indeed borne out by a comparison, and the court concludes that the signatures on the sales slips are forgeries. Under all the facts elicited at the trial, there is no evidence which in any way demonstrates that the defendant failed to exercise reasonable care with respect to the credit card issued to her by plaintiff nor that she authorized anyone else to act in her stead.

Plaintiff contends that the defendant is liable for all the purchases made in her name through the use of said card and relies on the paragraphs of the credit agreement referred to herein, asserting that under paragraph 1 and the sections of the General Business Law her lack of negligence or knowledge that the card was lost has no relevance to the issue of liability.

As stated earlier, defendant could not meet the condition contained in paragraph 1 because it was impossible to give notice of the credit card's loss or theft inasmuch as she never had knowledge of those facts until her visit to the plaintiff's store on July 14. While the statute is clear in that a holder is permitted to limit liability where he has knowledge of loss or theft of the card and so notifies the issuer, the statute does not expressly state that the holder of the card will be liable even in the absence of negligence, or that the holder, even if unaware of the theft of the card, assumes liability for purchases made by a thief.

The fact that the credit card was being used without authorization as a result of loss or theft, standing alone, cannot be equated with a finding that defendant failed to exercise reasonable care.

Since the legislation in issue is not specifically directed to the facts herein, recourse must be made to the common law for the principles which determine responsibility.

For centuries the law of torts has been founded on the principle that there can be no liability without fault (Holmes, Common Law [1881], pp. 144–163; 30 Harv. L. Rev. 241, 319, 409; Salmond, Law of Torts [7th ed., 1924], pp. 11, 12).

In the few cases which have considered similar problems arising from the use of credit cards or credit devices (158 A. L. R. 762 [1945]), the determination of liability fluctuated slightly from an equitable rule that as between innocent parties he who makes the loss possible should bear the consequences (*Wanamaker* v. *Megary*, 24 Pa. Dist. 778 [Phila. Mun. Ct., 1915]) to the rule that in the absence of an express contract each party owes the other a duty of due care, the card holder in using the card and the issuer merchant in honoring it (*Lit Bros.* v. *Haines*, 98 N. J. L. 658 [1923]). It has also been held that in the absence of an express contract each party owes the other a duty of due care (*Gulf Refining Co.* v. *Plotnick*, 24 Pa. D. & C. 147 [C. P., 1935]; see, also, The Tripartite Credit Card: A Legal Infant, 48 Calif. L. Rev. 459, 481–488).

It is to be noted that the relationship between the plaintiff and the defendant in this case is a modest two-party arrangement entitling the user to credit at the plaintiff's store and no other. It is unlike the '' omnipotent credit card * * * used to procure U-drive automobiles, airline tickets, luxurious hotel suites, food and drink, multifarious items of men's wear, a silver mink stole for a newly acquired girl friend, and a puppy dog '' for the sole user, where a credit card is characterized as '' like an Aladdin's lamp and you didn't even have to rub it '' (Miraglia, My $10,000 Credit Card Binge, Life, Oct. 26, 1959, pp. 53–54, as cited in comment, The Tripartite Credit Card, *supra*, p. 459). It is the use of this latter card, with broad, diversified application and which involves three or more parties — issuers, holders, users, independent retailers and thieves — which has caused courts to fashion the rule that the holder of a credit card is responsible, even in the absence of an express contractual provision, for all unauthorized purchases except if he can establish negligence on the part of the retailer responding to the presentation of the credit card (*Union Oil Co. of Cal.* v. *Lull*, *supra*).

A parallel situation under the tripartite relationship may be seen in *Texaco* v. *Goldstein*, 34 Misc 2d 751, affd. 39 Misc 2d 552 [App. Term, 1st Dept.]) where the holder of the lost credit card containing liability limitation provisions similar to the case at

bar failed promptly to notify the plaintiff of his loss. The trial court, WAHL, J., held the credit card was a binding contract the provisions of which were assumed by defendant, and the defendant was liable for purchases made at numerous Texaco stations in various States. Implicit in this decision is not merely a finding that the defendant failed to exercise due care with respect to the card but that the various retail stations had no reason to question the presentation of the card by its larcenous holder.

The answer to the question whether in this case plaintiff's business conduct contributed to its loss is much simpler. Two hundred thirty-seven sales slips bearing forged signatures were permitted to accumulate in a 30-day period. Under the data-processing procedures then in use in plaintiff's store, if the customer's account balance exceeded $200 a '' spill-out '' was to occur, indicating purchases over and above the limit provided by the credit agreement. Plaintiff argues that it was unable to minimize defendant's liability until it sorted and collected all outstanding sales slips and processed them through its data-processing equipment. Only then did suspicions arise that something was amiss and it summoned its customer, whom it now sues.

While it may be imperative in this age of modernization for mercantile establishments to embrace, compress and sort information from differing departments through the use of electronic data-processing equipment, it is manifestly unfair to shift the burdens of its inadequacies or failures to the innocent consumer whose status, in this modern day, remains unchanged. It is immaterial whether the defendant is the sole customer or is one of one and a half million customers to whom credit cards have been issued by plaintiff (plaintiff's brief, p. 9).

To pursue the plaintiff's position to an absurd end were the rule that espoused by plaintiff, depending upon how quickly plaintiff discovered suspicious sales a customer could, without negligence on his part, be chargeable through the use of plaintiff's credit card for items totaling $10,000 or $100,000 as well as the $2,460 sought here.

While a vendor granting credit status to a customer assumes the risk that it may not be paid for goods, it issues credit in order to enlarge its reservoir of prospective sales. However, there is a concurrent duty owing from the vendor to the customer that it will not permit this credit status of the customer to be abused. Thus I must conclude that under common-law principles of tort law applicable plaintiff has established no right to a **recovery.**

It is also argued by plaintiff that possession of the card itself determines responsibility. Plaintiff states, "In effect, the possession of the card is the indicia of ownership" (plaintiff's brief, p. 2). Plaintiff is thus asserting that the user of the card is the agent of the named holder in effecting the sales in question and seeks comfort in section 512 and the paragraphs of the credit agreement here.

Certainly if defendant knew of the unauthorized use of the card and failed to notify the plaintiff such conduct would amount to a ratification of purchases by the thief, and liability could be predicated upon failure to give notice under section 512 and the agreement. A principal may adopt a contract by subsequent assent and may even affirm a transaction which is tortious or criminal (Restatement, Agency, 2d, §§ 84, 95) and silence, where there is an opportunity to speak, may also amount to a ratification (Restatement, Agency 2d, *supra*, § 95, comment a). But for there to be an agency there must be knowledge or awareness of the existence of the agent. Thus in *Magnolia Petroleum Co. v. McMillan* (168 S. W. 2d 881 [Texas Civ. App., 1943]) the holder of a credit card was held liable where he loaned the card to others even where he was unaware of the actual purchases.

Thus I cannot conclude that in enacting section 512 the Legislature intended to constitute the thief of the credit card as the agent of its named holder.

Obviously the relative rights of the parties herein cannot be ascertained with reasonable certainty in the penumbras of statute and contract.

By applicable common law, while there is a duty on the part of the credit card holder to exercise reasonable care over the said card, there is a concurrent obligation on the part of the issuer, at least in a bipartite relationship, to protect its customer from the imposition of unjust charges. Here plaintiff has failed to meet that obligation.

In arriving at this conclusion I have found as a fact that the defendant was given and received the notice required under the pertinent provision of section 512 of the General Business Law inasmuch as the credit card agreement sued upon was executed in 1961.

Accordingly, judgment will be entered in favor of the plaintiff in the amount of $86 together with costs and interest from the first day of December, 1965.