296 A.2d 112.

BURTON GOLDSTEIN *et al. vs.* RHODE ISLAND HOSPITAL TRUST NATIONAL BANK.

SEPTEMBER 26, 1972.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J. Sometime prior to February, 1970, plaintiff (sometimes hereafter referred to by his last name) like thousands of the inhabitants of this state received in the mail from the defendant bank (hereafter called the bank) a plastic passport to, depending on one's point of view, instant credit or instant debt. This plasticized wonder is better known as a credit card. The credit cards were not solicited by the recipients but rather the defendant bank, to-

gether with other banks in this area, made a wholesale distribution of the cards as they attempted to make an auspicious entry into a new and presumably attractive field of consumer credit.

Goldstein used his credit card to make various purchases and in the process incurred a debt to the bank of $242. He did not or could not pay the debt. Consequently, on September 8, 1970, the bank obtained a judgment in the District Court against Goldstein in the amount of $323. This figure represented the $242 balance plus an attorney's fee of $81. Goldstein made a series of payments to the bank which reduced the amount of the judgment to $110. At this point, he consulted an attorney and in January, 1971, the District Court granted his motion to vacate the judgment and recall the execution.

The plaintiff then instituted this class action which challenges the interest rates and counsel fees charged delinquent debtors. In his effort to recover some $3,000,000 in damages, plaintiff has filed an original complaint, an amended complaint and a second amended complaint. At two separate hearings held in the Superior Court, two different justices of that court granted various motions filed by the bank so that Goldstein is presently out of court. He is before us trying to reopen the courtroom doors.

Before proceeding, we shall detail the initial distribution plan referred to earlier. Goldstein received his credit card in the mail.[1] It was attractively packaged. Two credit cards were inserted in a cardboard folder. The cardboard is folded in half. Three-quarters of the surface of the cardboard contains printed messages extolling the virtues of the card, such as, "It's free," "Extend your payments

---

[1] In 1970, the General Assembly enacted legislation specifically barring the unsolicited mail distribution of credit cards in this state. Public Laws, 1970, chap. 177, now cited as §6-30-1. Prior to this legislation, the recipient received two cards. One was for the addressee and the other was for anyone whom the addressee authorized to use this card.

if you wish," "It's all you'll ever need!" These pleasant exhortations appear in boldface print. When the card is removed from its enclosure, there appears the word "Important" in large boldface print and a direction to read the "enclosed agreement." On the reverse side of this bottom-half of the card is set out the "Cardholder Agreement." We have attached to this opinion an appendix showing that half of the cardboard folder which contains the cards and the agreement. They were made part of the bank's brief but to the best of our knowledge they were not before either trial justice.

On one side, the credit card contains at its top the name "BankAmericard" in large bold print, a space for the authorized signature and the lower third has the holder's name embossed thereon. The reverse side of the credit cards looks like this:

**Rhode Island Hospital Trust National Bank**
PROVIDENCE, R I.

By retaining, signing using or authorizing the use of this card issued by the bank named above ("Bank"), the named holder agrees to the terms hereof and to those of Bank's Cardholder Agreement and all future amendments thereto.
Holder agrees to pay to Bank the amount of all purchases made by or credit extended to any person using this card prior to the surrender of this card or receipt by Bank of written notice of its loss or theft, together with finance charges where applicable in accordance with said Cardholder Agreement and billings pursuant thereto
This card is the property of Bank, may be cancelled by Bank at any time and shall be surrendered upon demand

AUTHORIZED USERS MUST SIGN ON THE FRONT AND ARE RESPONSIBLE FOR ALL CREDIT EXTENDED BY BANK IN CONNECTION WITH THEIR USE OF THIS CARD.

©BankAmerica Service Corp. 1958, 1968 ©Servicemarks owned and licensed by BankAmerica Service Corp.

[A6728]

The plaintiff's original complaint was met with the bank's motion for a more definite statement. The motion was granted and an amended complaint was filed. It contains three counts.

In essence, Goldstein contends in his first count that,

because of the packaging of the card, the placing of the terms on the Cardholder Agreement and the microscopic type which is found on the credit card and cardboard folder, he never had actual or constructive notice of the provisions relating to interest charges and other costs, particularly attorney's fees. His second count charges the bank with an abuse of process while the third count describes the bank as being engaged in the illegal practice of the law. The bank filed a motion to dismiss based upon the ground that Goldstein failed in either of the three counts to set forth a claim upon which relief could be granted. Super. R. Civ. P. 12(b)(6).

The trial justice granted the motion as it related to the first count and the first portion of the second. He denied the motion as it sought to invalidate the second portion of the second count and the third count. The plaintiff was afforded an opportunity to replead the second part of his abuse of process count.

The second amended complaint contains an abuse of process count and repeats the illegal practice of the law count. The bank filed another motion to dismiss. It relied upon Rule 12(b)(6) and for the first time claimed that plaintiff was not truly representative of the class for whose benefit he brought the suit. This motion was heard by another justice of the Superior Court. He granted the motion because of an alleged failure to state a proper claim but he made no finding as to plaintiff's status.

We shall first review the grant of the dismissal of the first count and then consider the subsequent dismissal of the counts charging an abuse of process and the illegal practice of law.

The trial justice, who dismissed the first count, relied on the general rule that the furnishing of a credit card which contains certain terms and conditions constituted an offer which ripened into an expressed contract by Goldstein's

retention and use of the card. This was so, said the trial court, even though the terms relating to counsel fees and interest charges were set forth on a different document, to wit, the Cardholder Agreement. We have no quarrel with the rule as cited by the first trial justice. We are, however, concerned with a 12(b)(6) motion whose sole function is to challenge the sufficiency of the complaint. *Palazzo* v. *Big G Supermarkets, Inc.*, 110, R. I. 242, 292 A.2d 235 (1972). In such circumstances, our guiding light has ever been the principle that a motion to dismiss brought pursuant to Rule 12(b)(6) should not be granted unless it appears beyond a reasonable doubt that the plaintiff would not be entitled to any relief no matter what state of facts could be proved in support of his claim. In determining whether there is such a doubt as will warrant the termination of litigation in the pleading stage, we are bound to resolve all doubts in the plaintiff's favor and accept all his allegations as true. *Noble Co.* v. *Mack Financial Corp.*, 107 R. I. 12, 264 A.2d 325 (1970); *Warren Education Ass'n* v. *Lapan*, 103 R. I. 163, 235 A.2d 866 (1967); *Bragg* v. *Warwick Shoppers World, Inc.*, 102 R. I. 8, 227 A.2d 582 (1967).

The rule of law referred to by the trial justice has been followed in numerous instances where courts have held the holder of the credit card liable for unauthorized purchases because the contract called for liability until the card was surrendered or its loss reported to the company. *Texaco, Inc.* v. *Goldstein*, 34 Misc.2d 751, 229 N.Y.S.2d 51, *aff'd*, 39 Misc.2d 552, 241 N.Y.S.2d 495 (1963); *Union Oil Co.* v. *Lull*, 220 Ore. 412, 349 P.2d 243 (1960); *Magnolia Petroleum Co.* v. *McMillan*, 168 S.W.2d 881 (Tex.Civ.App. 1943).

Although we do not quarrel with the law as cited by the trial justice, we do disagree with his dismissal of the first count. A dismissal under Rule 12(b)(6) is to be granted only in the unusual instance in which a plaintiff

includes allegations that show on the face of the complaint that there is some insuperable bar to relief. 5 Wright & Miller, *Federal Practice and Procedure* §1357 at 604 (1969). There is no such bar apparent in plaintiff's first count.

In the *Union Oil* case, the court observed that the credit cardholder had failed to raise either in his pleadings or by way of evidence the argument that he was not aware of the conditions printed on the back of the credit card and so he was bound by them. It noted that juries could pass on whether or not "* * * the terms of the contract were put in deceptive form which would mislead a reasonable person, and that defendant was so misled * * *." 220 Ore. at 420, 349 P.2d at 247. The plaintiff here has not made the same tactical error as *Lull*. Instead, he has alleged enough so that he may rely upon the cases which hold that a person is not bound by the terms of a written agreement if he has no knowledge of its terms because the manner in which they are embodied in the instrument would not lead a reasonable person to suspect that the terms are part of the contract. *Dailey* v. *Holiday Distributing Co.*, 260 Iowa 859, 151 N.W.2d 477 (1967); see *Trainer* v. *Morison*, 78 Me. 160, 3 A. 185 (1886); *Egan* v. *Kollsman Instrument Corp.*, 21 N.Y.2d 160, 234 N.E.2d 199 (1967); *Cutler Corp.* v. *Latshaw*, 374 Pa. 1, 97 A.2d 234 (1953); *WXIX, Inc.* v. *Scott Heating and Air Conditioning Co.*, 38 Wis.2d 278, 156 N.W.2d 451 (1968); see also 3 Corbin, *Contracts* §607 (1960); 10 Williston, *Contracts* §1213 (3d ed. Jaeger 1967).

Having in mind the liberality afforded the pleader, we believe that he has alleged enough facts which, if sustained by proof, would warrant relief. Whether he can prevail is a matter to be determined on the basis of his proof rather than on his pleadings. Any doubt as to his ultimate success is no cause at this stage of the proceeding for the dis-

missal of the first count. The initial dismissal of the first count was erroneous.

The dismissal by the second Superior Court justice of the amended abuse of process was proper. Abuse of process has been defined as the perversion of legal process once it has been issued. *Manufacturers Supply Co.* v. *Parker,* 103 R. I. 426, 238 A.2d 616 (1968). In order to prevail on this ground, Goldstein had to first allege that the bank has used the process to accomplish some ulterior purpose for which it was never intended. Any recitation of the verbiage found in the abuse of process count would do nothing but compound the confusion. It is enough to say that plaintiff has not even come close to pleading such an action.

The unlawful practice of law count was based on plaintiff's allegation that the bank collected money from the members of the class which was designated as payment to the attorney for services performed in collecting the debt due from the holder but which was actually for other purposes.

When the bank first moved to dismiss this count under Rule 12 (b)(6), it supplied an affidavit from the lawyer who did its collection work. In one portion of his affidavit, the attorney stated that he billed the bank at a rate of $40 an hour and that when a collection was made, the entire amount, including his fee, was forwarded to the bank and the amount designated as the fee is "set off" against previous billings on *"various accounts."* The submission of the affidavit in support of the motion to dismiss not only led the trial justice to sustain the disputed count but it also transformed the 12(b)(6) motion into one seeking summary judgment. *Menzies* v. *Sigma Pi Alumni Ass'n,* 110 R. I. 488, 294 A.2d 193; *Palazzo* v. *Big G Supermarkets, Inc., supra.* The first trial justice found a disputed question of fact and denied the motion. The second trial justice granted defendant's motion even though the count before him

was identical to the one considered earlier. The reversal of the initial determination made on the unlawful practice of the account is a violation of what is known as the law of the case. *Columbus Ornamental Iron Works, Inc.* v. *Martin,* 103 R. I. 620, 240 A.2d 405 (1968). If, after the denial of the first motion, new material had been introduced which significantly extends the record, then a second motion for summary judgment would be entertainable. *Allstate Finance Corp.* v. *Zimmerman,* 296 F.2d 797 (5th Cir. 1961). Recently, we stressed that once a motion for summary judgment has been heard and decided, it should not again be reviewed by another justice of the same court absent the most compelling and exceptional circumstances. *North American Planning Corp.* v. *Guido,* 110 R. I. 22, 289 A.2d 423 (1972). Since the record is devoid of any such circumstances, the dismissal of the third count was erroneous.

A final comment relative to the plaintiff's status as being truly representative of the class. From the record before us, we cannot determine if this particular issue was pressed in the Superior Court. The second trial justice rested his grant of the bank's motion to dismiss solely on his finding that the plaintiff had failed to state a claim upon which relief could be granted. Confronted with a silent record and the lack of any appropriate findings by the trial justice, we believe the plaintiff's status is a question to be resolved at trial time. This action has been in the pleading stages for a far too long period of time.

The plaintiff's appeal is sustained in part and denied in part. The orders as they relate to the first count of the amended complaint and the practice of law count of the second amended complaint are vacated. The judgment relating to the abuse of process count of the second amended complaint is affirmed. The case is remanded to the Superior Court for further proceedings.

# APPENDIX

## View of folder with cards in place:

AUTHORIZED SIGNATURES                 AUTHORIZED SIGNATURES

a Service Marks Owned and Licensed by BankAmerica Service Corp.
[A6729]

## View of folder with cards removed:

**IMPORTANT:** Your BankAmericard should be signed at once by the authorized users in your family. Read the enclosed agreement. You can now take advantage of BankAmericard convenience immediately. Today! If you'd like additional cards for other members of your family just let us know.

Your BankAmericards should be signed by authorized users as indicated below. Please be sure to destroy your old card immediately.

Cardholder        Authorized users

BANKAMERICARD    BANKAMERICARD
Edward Q Poer    Nathole C Que

a Service Marks Owned and Licensed by BankAmerica Service Corp.
[A6730]

## Cardholder Agreement*

Initial use, retention or signing of a BankAmericard Charge Card ("Card"), by the person whose name is embossed thereon ("Holder"), or by any person authorized or permitted by the Holder constitutes the Holder's acceptance of the terms and conditions contained in this Agreement.

1. Holder requests Rhode Island Hospital Trust National Bank ("Bank") to extend credit to Holder (a) by paying to the merchant named thereon for the account of and charging to Holder the total amount of sales drafts or vouchers evidencing purchases made on the basis of the Card and (b) by permitting cash advances to be obtained on the basis of the Card.

2. Holder agrees to pay Bank for all purchases made, services rendered and cash advances made by or to any person using the Card, together with any FINANCE CHARGES, prior to its surrender to Bank or Bank's receipt of written notice that the Card has been lost or stolen. Lost or stolen Cards should be immediately reported to Bank.

3. Bank will furnish Holder a monthly statement for all purchases and cash advances made through the use of the Card, setting forth with respect to such period (a) previous balance (b) payments and credits, (c) new cash advances, (d) FINANCE CHARGE, computed as hereinafter provided, (e) balance on which FINANCE CHARGE was computed, (f) new purchases; (g) new balance; (h) the date by which payment of the new balance must reach Bank to avoid additional FINANCE CHARGES, (i) ANNUAL PERCENTAGE RATES and (j) such other information as is required by law or deemed by Bank to be of assistance to Holder. Such statement shall be conclusively deemed correct and accepted by Holder unless Bank is notified in writing of any alleged errors therein within ten (10) days from receipt of the statement by Holder. Holder agrees to pay Bank within twenty-five (25) days from the date of each statement either (i) the full amount due (including FINANCE CHARGES, if any) or (ii) at Holder's option, a monthly payment of no less than 1/20 of the full amount due or $10.00, whichever is the greater.

4. No FINANCE CHARGE shall be imposed by Bank on amounts owing for purchases only made during previous month if Holder pays the full amount due (including FINANCE CHARGES, if any) shown on any monthly statement within twenty-five (25) days from the date of such statement Cardholder agrees to pay to Bank a FINANCE CHARGE based upon the sum of (a) the portion of the previous balance shown on any monthly statement which has not been repaid within 25 days after the date of the prior monthly statement and (b) the average daily outstanding balance of new cash advances charged to Holder during the current billing period. Said FINANCE CHARGE shall be computed (1) at the periodic rate of $1\frac{1}{2}\%$ per month on amounts owing for purchases up to and including $500.00 and $1\%$ on amounts owing for purchases in excess of $500.00, said periodic rates being equivalent to ANNUAL PERCENTAGE RATES of $18\%$ and $12\%$ respectively, and (2) at the periodic rate of $1\frac{1}{2}\%$ per month on amounts owing for cash advances up to and including $500.00 and $1\%$ on amounts owing for cash advances in excess of $500.00, said periodic rates being equivalent to ANNUAL PERCENTAGE RATES of $18\%$ and $12\%$ respectively (ANNUAL PERCENTAGE RATES of $18\%$ and $12\%$ respectively). All payments will be applied first to previously billed and unpaid FINANCE CHARGES, and thereafter to any amounts owing for unpaid cash advances and purchases in proportion to the outstanding balances thereof.

5. Bank has established and advised Holder by separate document of the limit on the aggregate amount of credit extended to Holder Holder shall not make or permit use of the Card for any purchase or cash advance which would exceed such limit. In the event such limit is exceeded at any time, the entire amount then owing by Holder to Bank shall, at the Bank's option, become payable on demand.

6. Bank shall not be responsible on account of any refusal by anyone to honor Holder's Card.

7. Holder waives as against Bank all claims now or hereafter existing of Holder against merchant selling merchandise or rendering service and Holder agrees to settle all disputes with Seller Cash refunds will not be made on purchases made through use of a Card and a merchant granting a refund or adjustment will initiate a credit to Holder's account with Bank.

8. The privileges attaching to any Card may be revoked by Bank at any time without notice to Holder All Cards are the property of the Bank and any Card may be canceled at any time without notice, and shall be surrendered to Bank upon demand.

9. In the event that (a) Holder fails to comply with any term or condition of this Agreement, or (a) Holder fails to make payment when due, dies or becomes the subject of bankruptcy or insolvency proceedings, the full amount owing by Holder shall, at Bank's option, become immediately due and payable Holder agrees to pay all reasonable costs of collecting amounts due, including attorney's fees and legal expenses.

10. Bank reserves the right to amend or modify this Agreement. A copy of such amendment or modification will be mailed to the Holder at his last known address shown on the records of Bank. Any amendment or modification shall become effective on the date specified therein, which date shall not be less than thirty days subsequent to date of mailing.

11. The Holder may surrender the Card and terminate this Agreement as to future use of the Card at any time No such termination of this Agreement by Holder shall be effective as to obligations of the Holder with respect to use of the Card or cash advances received prior to the date such termination is received by Bank.

*This appears on the reverse side of the portion of the folder that holds the cards.

*David Hassenfeld,* for plaintiffs.

*Edwards & Angell, Stephen A. Fanning, Jr., John H. Blish, Deming E. Sherman,* for defendant.